Hillsborough-northern judicial district
No. 92-516

THE STATE OF NEW HAMPSHIRE

v.

JASON CARROLL

July 22, 1994

*Jeffrey R. Howard*, attorney general (*Tina L. Nadeau*, assistant attorney general, on the brief and orally), for the State.

*Kinghorn & Maynard, P.A.*, of Nashua (*Stephen L. Maynard* and *Eric R. Wilson* on the brief, and *Mr. Maynard* orally), for the defendant.

HORTON, J. The defendant, Jason Carroll, was convicted after two jury trials in Superior Court (*Murphy*, J.) of second degree murder and conspiracy to commit murder. He appeals, arguing that his confession was involuntary and that the police violated his right to remain silent. We affirm.

The pertinent facts follow. The strangled and stabbed body of Sharon Johnson, then in an advanced stage of pregnancy, was found at a Bedford construction site on the morning of July 29, 1988, and the State Medical Examiner determined that she had been killed the night before. New Hampshire State Police Sergeant Roland Lamy was later assigned to the case and learned from one Tony Pfaff that the victim's husband, Ken Johnson, had solicited Pfaff to move the victim's car shortly after the time of the murder. Investigation into Pfaff's background revealed that the nineteen-year-old defendant worked with Pfaff, and that the defendant had not reported for work on the night of the murder. Lamy first interviewed the defendant on November 24, 1989, at the National Guard Armory. The defendant admitted having been at the murder scene with Pfaff and Johnson but admitted no other involvement in the murder. After completing a written statement to this effect, the defendant indicated he was tired and, agreeing to continue the interview three days later, went home with his parents.

On the morning of November 25, however, the defendant told his parents that he wanted to recant his previous statements to the police. After the defendant unsuccessfully tried to contact Lamy, Karen Carroll, the defendant's mother and a Bedford police officer, called her colleague, Bedford Police Captain Leo Morency, who drove to the Carroll home where he advised the defendant of his *Miranda* rights. After Morency spoke with Lamy by telephone, the defendant agreed to go to the Bedford police station to continue the interview. The defendant drove himself and his mother to the police station, where, at about 1:30 p.m., he met Lamy and Morency in Morency's office, which measured about 10 feet by 10 feet and had two outside windows. Shortly thereafter, State Police Sergeant Neal Scott joined the interview. After Lamy reminded the defendant that he was "still under *Miranda*," the defendant denied any knowledge of the murder. In a sometimes raised voice, Lamy repeatedly said he did not believe the defendant. At about 2:45 p.m., the defendant asked to have his

mother present. While Lamy went to get the defendant's mother, the defendant told Morency and Scott that his statement of the day before was true, and that he was afraid of Johnson and Pfaff. Lamy later testified at the suppression hearing that before Karen Carroll entered the interview room, he told her that she was entering as the defendant's mother, not as a police officer, and that, although she was not to assist the police in their interrogation, she was free to do anything she wanted as the defendant's mother. Lamy and Scott both testified that Lamy gave a similar instruction in the presence of the defendant.

The interview resumed, and at about 3:20 p.m., Morency activated an audio tape recorder. During the recorded portion of the interview, Karen Carroll began to aggressively question her son. Both she and Lamy used raised voices at times, and several times the defendant began to cry. Morency and Scott testified that it was one of the most emotional and intense interrogations they had ever witnessed. During the taped interview, the defendant admitted, *inter alia*, that he had agreed with Pfaff to participate in the murder for $2000, that he had helped Pfaff trick the victim into being driven from a mall to the construction site, that he had been the first to stab the victim, that he had helped move the victim's car after the murder, and that his own pocket knife was the murder weapon. At this point, the defendant broke down and, in tears, said, "I just want to go home. I want to go home. I want to go home. . . . I want to go home." The interview continued for another two minutes, concluding at 3:49 p.m. After the interview, the defendant completed a written statement and a consent search form for the murder weapon. When asked to diagram the murder scene, the defendant said he was too tired. At about 5:30 p.m., after agreeing to complete the diagrams the next day, he went home with his mother. On November 27, the defendant agreed to another interview, during which he admitted that he had been paid $5000 and that he and Pfaff had forced the victim into the car at the mall. That night the defendant was charged with capital murder.

## I. Voluntariness of Confession

■ On appeal, the defendant argues that his November 25 confession was involuntary and admitted in violation of part I, article 15 of the State Constitution and the fifth and fourteenth amendments to the Federal Constitution because it was induced by improper police techniques, including promising leniency, conditioning his protection on confessing, and misleading him that he was not a suspect. Because the State Constitution provides greater protection to a criminal de-

fendant with respect to the voluntariness of confessions than does the Federal Constitution, *see State v. Carpentier*, 132 N.H. 123, 128, 562 A.2d 181, 184 (1989), we decide this case under the State Constitution with reference to federal cases only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 232, 471 A.2d 347, 351 (1983).

Whether a statement is voluntary is a question of fact. *State v. McDermott*, 131 N.H. 495, 500, 554 A.2d 1302, 1305 (1989). The State must prove voluntariness beyond a reasonable doubt, *State v. Phinney*, 117 N.H. 145, 147, 370 A.2d 1153, 1154 (1977), and a trial court's finding of voluntariness will not be reversed unless it is contrary to the manifest weight of the evidence, *McDermott*, 131 N.H. at 500, 554 A.2d at 1305. A statement is voluntary only if it is the product of an essentially free and unconstrained choice and thus must be considered involuntary where the defendant's will has been overborne by improper police tactics. *State v. Reynolds*, 124 N.H. 428, 434, 471 A.2d 1172, 1175 (1984). Although we have said that a confession is involuntary if "'extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence,'" *see State v. Copeland*, 124 N.H. 90, 92, 467 A.2d 238, 240 (1983) (quoting *Bram v. United States*, 168 U.S. 532, 542–43 (1897)) (brackets omitted), voluntariness is more properly determined by considering the totality of the circumstances. *See Carpentier*, 132 N.H. at 129, 565 A.2d at 184; *see also Arizona v. Fulminante*, 499 U.S. 279, 285 (1991) (explaining that the *Bram* test for voluntariness is inconsistent with the current totality of circumstances test).

The defendant first argues that his confession was involuntary because it was induced by promises of immunity and leniency from both his mother and Lamy. While, under the totality of circumstances test, most promises by the police to the defendant are not dispositive of voluntariness, a confession made in reliance upon a promise of confidentiality or a promise of immunity is *per se* involuntary. *See McDermott*, 131 N.H. at 501, 554 A.2d at 1305. Our constitution, however, is offended only by State action, *see State v. Chapman*, 135 N.H. 390, 400, 605 A.2d 1055, 1062 (1992); *cf. State v. Tapply*, 124 N.H. 318, 325, 470 A.2d 900, 905 (1983) ("neither the government nor any of its agents had any power to violate or infringe upon [defendant's State constitutional] rights"), and thus, even "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." *Colorado v. Connelly*, 479 U.S.

157, 166 (1986). Here, the trial court properly found that Karen Carroll, although a Bedford police officer, was not an agent of the State inasmuch as Lamy had cautioned her, first outside and then in the defendant's presence, as to her private role. The defendant argues, however, that even if his mother was not an agent of the State, the police had a duty to correct her misstatements and promises. While we refuse to recognize such a categorical duty, in certain cases a trial court may find that, by their conduct, the police have essentially adopted the representations made by a private person. Here, the defendant did not argue that such adoption occurred; nor does the record compel that finding. Particularly, we note that, at the outset, the police attempted to distance themselves from any statement Karen Carroll might make by detailing, in the defendant's presence, her limited and private role. Accordingly, we concern ourselves only with those statements made by Lamy.

The defendant directs us to only one alleged exchange (we are unable to discern Lamy's statement from the tape provided to us) involving Lamy that he argues was a promise of leniency:

> "[Mother]: The longer you put off telling the truth, the harder it is gonna be, and the worse it is gonna be on yourself because you still have a chance to save your ass, my dear. I don't want to see you go to prison . . .
>
> [Defendant]: I don't want to go to prison either Ma.
>
> [Lamy]: Then tell us the truth."

Even assuming this statement was made, it is nothing like the explicit promises of confidentiality made to the defendant in *McDermott* that led us to find a subsequent confession involuntary. There, the defendant told DEA agents of his involvement in a murder after he was repeatedly assured that nothing he said would be related to State authorities. Here, Lamy's statement does not compel an interpretation as a promise of immunity but may be reasonably interpreted as a mere exhortation to tell the truth. Any interpretation of Lamy's statement as a promise, when considered in the context of the whole interrogation, is strained. While Lamy made no other reference to immunity or leniency, the interrogation was replete with exhortations to tell the truth. Accordingly, a finding that Lamy's statement was both intended, and should reasonably have been perceived, as merely an exhortation, is adequately supported by the record.

Even if we assume that Lamy's statement constituted a promise of immunity, such a promise does not require a finding of involuntari-

ness unless it *induced* the defendant to confess. *See McDermott*, 131 N.H. at 501, 554 A.2d at 1305. In other words, while a confession made in reliance on such promises is involuntary, a confession motivated by other factors is not. *See, e.g., United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) (defendant confessed because overwhelmed by evidence police had amassed); *Bolder v. Armontrout*, 713 F.Supp. 1558, 1571 (W.D. Mo. 1989), *reversed on other grounds*, 921 F.2d 1359 (8th Cir. 1990).

■■ Here, the evidence supports a finding that the defendant's decision to confess was not due to Lamy's "promise." The "promise" was made less than ten minutes before the end of the taped interview, and *after* the defendant had admitted stabbing the victim and having been paid to participate in the crime. While even the most tempting promise cannot induce a prior confession, here, the fact that devastating admissions were made prior to this "promise" also suggests that even the later admissions were not induced by the "promise," but instead by the same factors that motivated the earlier admissions. Particularly, the record strongly suggests that it was the torment of the defendant's conscience and his mother's overbearing questioning that precipitated the crucial admissions during the interrogation. Throughout the interrogation, the defendant repeatedly expressed his desire to confess, saying, "I have to let it go," "I want so much to get this over and out of my life," "I just want to get this over with," and "It's not gonna be easy like this, just to spit it out, I can't, I want to so much." Without Karen Carroll's frenzied, emotional and insistent questioning of her son, the defendant may well not have confessed. Consistently, it was her questioning, not Lamy's, that reduced the defendant to tears and preceded his crucial admissions. Our constitution would not tolerate such conduct by a State actor, but here, Karen Carroll conducted herself in her private capacity as a mother.

■ The defendant next argues that his confession was involuntary because the police conditioned protection from Pfaff and Johnson on his confessing. Admittedly, some courts have found confessions involuntary in cases where state agents said they would not protect the defendant from a credible threat of imminent harm from a third person unless the defendant confessed. *See Arizona v. Fulminante*, 499 U.S. 279 (defendant's confession involuntary where given in return for promise of protection from other inmates); *Payne v. Arkansas*, 356 U.S. 560 (1958) (threat of release to angry mob). The present case, however, is readily distinguishable and the record

supports a finding that none of Lamy's statements regarding protection from Johnson and Pfaff rendered the defendant's confession involuntary.

The defendant directs us to these statements made by Sgt. Lamy:

> "And if you're afraid, and you tell us what you're afraid of, including Mr. Johnson, we can take care of protecting you. We can't take care of protecting something we don't understand.
>
> . . . .
>
> Again we are putting the cart before the horse. Protection for your safety is commensurate on you convincing us that you want to be truthful. You haven't done that to me.
>
> . . . .
>
> Look, I understand that [you are afraid], we already told you, if you get to the bottom dollar here and tell us the truth, we will then discuss your safety."

Again, these statements, when viewed in isolation, could be taken as conditional promises of protection, but do not compel that interpretation. Such an interpretation, moreover, is inconsistent with other statements on the tape regarding protection. Both before and after these statements, and without seeking any *quid pro quo*, Lamy assured the defendant that, as far as he knew, the defendant had no reason to fear Johnson because he was living in Rhode Island, did not have any money, and his movements were monitored. Only after telling the defendant, "he's not going to approach you, not unless you know something we don't," did Lamy say, "And if you're afraid, and you tell us what you're afraid of, including Mr. Johnson, we can take care of protecting you. We can't take care of protecting something we don't understand." In this light, Lamy's comment should be construed not as conditioning his *willingness* to protect the defendant on the defendant making a confession, but as properly explaining that his *ability* to protect the defendant would be enhanced were he familiar with the substance of those threats and any information regarding the ability to carry them out.

Even if we assume that Lamy did condition protection on the defendant's confessing, the record again supports a finding that these statements did not induce the defendant's confession. As discussed above, the record strongly suggests that it was the weight of the defendant's conscience and his mother's aggressive questioning that yielded his confession. Finally, unlike in *Fulminante* and *Payne*, the record contains no evidence of a comparable credible threat of imminent harm.

The defendant next argues that his confession was involuntary because he was misled into believing that he was not a target of the investigation. *See United States v. Goldstein,* 611 F. Supp. 624 (D. Ill. 1985). Again the defendant directs us, without reference to the broader context, to isolated fragments of the interrogation transcript, including Lamy's statement that "[y]ou sound like a criminal, not a guy that has made a terrible mistake." That the defendant could believe he was not a criminal suspect strains credulity. Periodically during the interrogation, Lamy told the defendant that the tape of the interrogation would be played someday before a jury, warning him: "The jury will tear you apart. They will, they'll tear you apart if you're not telling the truth here." Both before and during the interrogation, the police warned the defendant that "anything you say can and will be used against you in a court of law." Finally, the defendant's own argument that he confessed because of promises of immunity or leniency undercuts his argument that he was misled into believing that he was not a target of the investigation.

Our review of the record reveals no other factor that undermines the trial court's finding of voluntariness. The approximately two-hour-long interrogation was not excessively prolonged, *cf. Connelly,* 479 U.S. at 163–64 n.1, there was no evidence that the defendant needed or was deprived of food, medical attention, or sleep, and while the interview was highly emotional and conducted at times in raised voices, an emotional response by a defendant does not render a confession involuntary absent overreaching, deception, or coercion by the police. *See State v. Pierce,* 130 N.H. 7, 10–11, 533 A.2d 34, 36–37 (1987); *see also McCall v. Dutton,* 863 F.2d 454, 460 (6th Cir. 1988) (confession voluntary despite shouting and emotionalism), *cert. denied,* 490 U.S. 1020 (1989).

## II. Right to Remain Silent

The defendant argues that even if his confession was voluntary, the police failed to scrupulously honor his request for silence when, toward the end of the taped interrogation, he said repeatedly, "I want to go home." *See State v. Laurie,* 135 N.H. 438, 442, 606 A.2d 1077, 1079, *cert. denied,* 113 S. Ct. 245 (1992); *see also Michigan v. Mosley,* 423 U.S. 96 (1975). Again, because the Federal Constitution provides no greater protection than does part I, article 15 of the State Constitution, we decide this issue under the State Constitution. Because the defendant was not in custody, we find no constitutional violation.

■ While *Miranda* and *Laurie* collectively require that persons subject to a custodial interrogation be advised of their right to remain silent, and that the police scrupulously honor an invocation of that right, where a person is not subject to a custodial interrogation, the obligation on the part of the police to issue *Miranda* warnings and to respect the invocation of *Miranda* rights does not attach. *See State v. Gravel*, 135 N.H. 172, 176, 601 A.2d 678, 681 (1991); *see also State v. Lewis*, 129 N.H. 787, 796–97, 533 A.2d 358, 364 (1987) (*Miranda* imposed no obligation on police where defendant, who was not in custody, requested a lawyer); *State v. Sheila Portigue*, 125 N.H. 338, 345, 480 A.2d 896, 900–01 (1984) (police need not honor defendant's assertion of right to silence or counsel where defendant was not in custody). Here, the trial court found that the defendant was not in custody on November 25.

■ Whether a defendant is in custody for purposes of *Miranda* is essentially a question of fact, and we will uphold the trial court's finding unless contrary to the manifest weight of the evidence or the result of an error of law. *Carpentier*, 132 N.H. at 126, 562 A.2d at 183. A defendant is in custody if subject to "formal arrest or restraint of movement of the degree associated with formal arrest." *Id.* (quotation omitted). In the absence of formal arrest, the trial court must consider how much the suspect's freedom of movement was curtailed and how a reasonable person in the suspect's position would have understood the situation. *Id.* at 126–27, 562 A.2d at 183. Factors that the trial court should consider include "the suspect's familiarity with the surroundings, the number of officers present, the degree to which the suspect was physically restrained, and the interview's duration and character." *Id.* at 127, 562 A.2d at 183.

■ There is ample support in the record for the trial court's finding that the defendant was not in custody at any point during the November 25 interrogation. To begin with, the conditions of the November 24 interview — enjoying freedom of movement, at one point going unescorted to the men's room, and, despite admitting being at the murder scene, returning home without restriction — bore on how the defendant reasonably viewed his position going into the interview the next day. On November 25, it was the defendant who requested the interview and drove himself to the police station. The defendant was familiar with the police station, having worked there one summer, and apparently felt comfortable enough to call Capt. Morency "Leo" during the interrogation. During the interview, the defendant was not physically restrained in any way, and the trial

court found that he enjoyed freedom of movement throughout the police station. Further, the trial court's finding that a reasonable person in the defendant's position would have thought that he or she was free to leave during the interrogation is supported by the fact that the defendant again went home, without restriction, after the interview. Finally, in light of the fact that the defendant on the previous day had requested and was permitted to leave, the very statement that the defendant now argues constituted an invocation of his right to silence — "I want to go home" — suggests that the defendant himself believed that he could have left if he so chose. *Cf. Carpentier*, 132 N.H. at 127, 562 A.2d at 183 (clear that defendant thought he was free to leave, where, during interview, he asked police to drive him to work and emphasized that he was willing to return for further questioning).

In sum, we hold that the trial court's findings of voluntariness and lack of custody are not against the manifest weight of the evidence nor based on an erroneous ruling of law.

*Affirmed.*

All concurred.