Rockingham
No. 97-617

THE STATE OF NEW HAMPSHIRE

v.

SCOTT FORD

July 21, 1999

*Philip T. McLaughlin*, attorney general (*Christopher H.M. Carter*, assistant attorney general, on the brief and orally), for the State.

*Gary Apfel*, assistant appellate defender, of Orford, by brief and orally, for the defendant.

HORTON, J. The defendant, Scott Ford, was convicted, *inter alia*, of one count of robbery armed with a deadly weapon, *see* RSA 636:1 (1997), and two counts of theft by unauthorized taking, *see* RSA 637:3 (1997). He appeals, arguing that the Superior Court (*Murphy*, J.) erred in denying his motion to suppress confessions made while he was in prison and in both convicting and sentencing him for robbery and theft as separate offenses. We affirm.

In August 1995, the defendant agreed to participate in a staged robbery of a jewelry store in Hampton Beach, with the cooperation of the store owner, as part of an insurance fraud scheme. On August 22, the defendant entered the store and indicated interest in purchasing jewelry. In response to the store clerk's inquiry as to method of payment, he pulled out a gun and ordered her to put jewelry stored in a display case into a duffel bag. He then ordered the clerk and store owner to lie on the floor and began emptying other jewelry cases himself. After directing the owner and clerk at gunpoint to surrender the jewelry that they were wearing, the defendant pushed them into the bathroom and closed the door. He continued taking jewelry from the store and finally escaped through a back window.

The defendant was indicted for the theft of the jewelry and robbery of the store clerk. After a jury trial in June 1997, he was convicted of robbery and two counts of theft. Upon motion by the defendant, the trial court consolidated the two counts of theft for the purposes of sentencing. It entered a final sentence of two seven and a half to fifteen years terms for the robbery conviction and consolidated theft convictions, resulting in a fifteen to thirty year prison sentence.

On appeal, the defendant first argues that incriminating statements he made to police on two occasions that led to his arrest for the Hampton robbery were obtained involuntarily and admitted in violation of Part I, Article 15 of the State Constitution and the Fifth and Fourteenth Amendments of the Federal Constitution.

On November 7, 1995, the defendant was arrested for passing a bad check and detained at a correctional facility in Rutland, Vermont. He was not then a suspect in the Hampton Beach robbery. He contacted the Federal Bureau of Investigation and met with special agent Michael Rosanova on November 8. After executing a written waiver of his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), the defendant advised Rosanova he had information about an armed robbery in Hampton Beach. Rosanova subsequently notified the Hampton Police Department. At the time, the Hampton police already had a suspect in custody charged with the robbery.

On November 10, Officer Lynn Charleston and Detective Philip Russell of the Hampton Police Department met with the defendant at the Rutland prison. At first, the defendant denied having spoken with the FBI, and the officers began to leave. After Russell commented on Rosanova's written report of the November 8th interview, however, the defendant admitted meeting with Rosanova and agreed to speak to the officers. The defendant initially spoke

generally about the robbery, referring to the gunman in the third person. When he began to refer to himself as the gunman, the officers attempted to administer *Miranda* warnings, but the defendant insisted on disclosing specific details of his participation in the robbery. He then informed the officers that he and his family had been subject to threats from organized crime in Massachusetts and that he was also in danger as a result of testimony he had given against prison guards in Maine. He requested protection for himself and his family. He eventually signed a written waiver of his *Miranda* rights and proceeded to supply further incriminating details of the Hampton Beach crime.

On November 14, the defendant telephoned Detective Russell and requested another interview, agreeing to provide a formal taped statement. They met the next day, along with Charleston and Rosanova, at the Rutland prison. Again, the defendant initially refused to cooperate, prompting the officers to gather their equipment and prepare to leave. Again, the defendant changed his mind and consented to the interview. He executed a written waiver of his *Miranda* rights and a consent to tape form. He then gave a detailed, extensive account of the Hampton Beach robbery. He repeatedly expressed concerns about his safety and the safety of his family and attempted to negotiate agreements regarding the location and duration of his prospective prison sentence.

Prior to trial, the defendant moved to suppress his November 10 and November 15 statements, claiming that they were involuntary and given in violation of his *Miranda* rights. After a hearing, the trial court denied the motion.

We address the State constitutional claim first, citing to federal law only to aid in our analysis. *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983). Because our State Constitution affords greater protection to a criminal defendant than the Federal Constitution in requiring the State to prove the voluntariness of the defendant's statements beyond a reasonable doubt rather than by a preponderance of the evidence, we need not undertake a separate federal analysis. *See State v. Beland*, 138 N.H. 735, 737, 645 A.2d 79, 80 (1994); *Colorado v. Connelly*, 479 U.S. 157, 158 (1986).

A statement is voluntary if it is "the product of an essentially free and unconstrained choice." *State v. Carroll*, 138 N.H. 687, 691, 645 A.2d 82, 84 (1994). "In determining the voluntariness of the confession, the trial court must examine the totality of the surrounding circumstances." *State v. Monroe*, 142 N.H. 857, 864, 711 A.2d 878, 883 (1998).

We are aware that, in contrast to our traditional deferential review of voluntariness of confessions, the federal courts apply a *de novo* review. *See, e.g., Miller v. Fenton*, 474 U.S. 104, 110-11 (1985). We do not, however, think that the *de novo* rule has been made binding on the States, *see State v. Jenner*, 451 N.W.2d 710, 716 (S.D. 1990), *cert. denied*, 510 U.S. 822 (1993), and we would not reach a different result here even if that rule were adopted. A finding of voluntariness, based ultimately on the fact finder's comprehension of the totality of the facts, *cf. Commissioner v. Duberstein*, 363 U.S. 278, 289 (1960), relies on the unique position of the fact finder, who assesses first-hand all of the verbal and nonverbal aspects of evidence presented, *cf. State v. Little*, 138 N.H. 657, 661, 645 A.2d 665, 667 (1994). Words printed on the sterile pages of a transcript do not convey the intangible dynamics or full sensory experience of trial that may influence evaluation of the facts. *Cf. id.* Hence, while the legal standard to be applied is a question of law, *cf. In re Cusumano*, 162 F.3d 708, 713 (1st Cir. 1998), the facts underlying the finding of whether a statement is voluntary present a question of fact, *Carroll*, 138 N.H. at 691, 645 A.2d at 84, and the application of law to facts is a mixed question reviewed deferentially, *cf. Salve Regina College v. Russell*, 499 U.S. 225, 233 (1991). Because of the trier of fact's superior position in evaluating this essentially fact-driven question, we will not overturn the trial court's finding of voluntariness "unless it is contrary to the manifest weight of the evidence." *Carroll*, 138 N.H. at 691, 645 A.2d at 84.

The defendant argues that he provided information to the officers in reliance upon promises that he and his family would be protected from harm and that he would serve a reduced sentence in New Hampshire. The record, however, amply supports the trial court's finding that the officers made no promises to the defendant on either occasion.

■ Testimony reveals that on November 10 the defendant initiated discussion of threats against his life and family. In response, the officers indicated they would inform the proper authorities of his fears. Similarly, on November 15, it was the defendant who attempted to solicit an agreement with the State. The police consistently responded that they would notify the authorities but could not promise specific results. Moreover, during the interview, the defendant acknowledged that no threats or promises had been made to him. There are no allegations that either interview was excessively long or that the defendant was deprived of food, sleep, or medical attention. *Cf. Carroll*, 138 N.H. at 695, 645

A.2d at 87. In light of the totality of the circumstances, we cannot say that the trial court erred in refusing to find that by agreeing to inform authorities of the defendant's willingness to bargain, "the police exerted such an influence on the defendant that his will was overborne." *State v. Reynolds*, 124 N.H. 428, 434, 471 A.2d 1172, 1175 (1984).

The only contrary evidence was the defendant's testimony, in which he claimed the officers promised protection, issued threats, and gave *Miranda* warnings only after his confession. The trial court is in a better position than we to assess the credibility of witnesses. *See State v. Copeland*, 124 N.H. 90, 92-93, 467 A.2d 238, 240 (1983). In denying the motion for suppression, the trial court specifically found that the defendant was not credible, and we find no reason to question its finding.

The defendant next argues that on November 10th he was subjected to custodial interrogation without being advised of his *Miranda* rights in violation of his State and Federal rights against self-incrimination. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amend. V.

In order to trigger *Miranda* protections, the defendant must be subjected to a custodial interrogation. *See State v. Graca*, 142 N.H. 670, 675, 708 A.2d 393, 396 (1998). Neither party disputes that there was interrogation of the defendant on November 10th. The question before us is whether the defendant was in custody. The defendant argues that because he was an inmate at the Rutland prison at the time of the interview, he was in custody for *Miranda* purposes as a matter of law. We disagree.

We have long stated that "[c]ustody determinations for *Miranda* purposes are *essentially* factual, and we will uphold the superior court's rulings unless contrary to the manifest weight of the evidence or the result of an error of law." *Id.* (quotation omitted). As with the voluntariness of confessions, we find it necessary to further clarify our standard of review for custody determinations.

For purposes of appellate review, the trial court's findings of historical facts relevant to the question of custody, that is, its determinations of "what happened," *see Kolb v. State*, 930 P.2d 1238, 1243 (Wyo. 1996), are entitled to the deference we normally accord its factual findings, *see State v. Atkinson*, 670 A.2d 276, 285 (Conn. 1996). Because the ultimate determination of custody requires an application of a legal standard to historical facts, it is not merely a factual question but a mixed question of law and fact. *Cf. Great Lakes Aircraft Co. v. City of Claremont*, 135 N.H. 270, 282, 608 A.2d 840, 848 (1992). Unlike voluntariness, custody is a law-dominated

mixed question in which "the crucial question entails an evaluation made after determination of [the historical facts]: if encountered by a 'reasonable person,' would the identified circumstances add up to custody as defined in *Miranda?*" *Thompson v. Keohane*, 516 U.S. 99, 113 (1995). The trier of fact is not "in an appreciably better position" than we to answer that question. *Id.* at 114-15 (quotation omitted). Therefore, although we will not overturn the factual findings unless they are contrary to the manifest weight of the evidence, we review the ultimate determination of custody *de novo. See State v. Wiernasz*, 584 N.W.2d 1, 3 (Minn. 1998); *State v. Eldred*, 564 N.W.2d 283, 287 (N.D. 1997).

Turning to our analysis, we address the defendant's State claim first, citing federal law only as an aid in our analysis. *Ball*, 124 N.H. at 231, 471 A.2d at 350. Because we have established that the Federal Constitution affords no greater protection than the State Constitution with regard to the defendant's rights under *Miranda*, we will not undertake a separate federal analysis. *Cf. State v. Monroe*, 142 N.H. at 868, 711 A.2d at 886.

Traditionally, custody entitling a defendant to *Miranda* protections "requires formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Graca*, 142 N.H. at 675, 708 A.2d at 396 (quotation omitted); *see also United States v. Ventura*, 85 F.3d 708, 710 (1st Cir. 1996). Absent a formal arrest, "the trial court must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable man in the suspect's position would have understood his situation." *Graca*, 142 N.H. at 675, 708 A.2d at 396 (quotation omitted).

When a defendant is already incarcerated at the time of interrogation, the traditional custody analysis is inappropriate because, by its very nature, a prison setting restrains the freedom of movement of its inmates. *See United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985), *cert. denied*, 479 U.S. 830 (1986). Applying the traditional analysis to prisoner interrogation would lead inexorably to a *per se* rule that all interrogations of prison inmates are custodial. *See id.* We decline to establish such a rule. Instead, we hold that when an individual is incarcerated for an offense unrelated to the subject of his interrogation, custody for *Miranda* purposes occurs when there is some act or circumstance that places additional limitations on the prisoner. *See United States v. Turner*, 28 F.3d 981, 983 (9th Cir. 1994), *cert. denied*, 513 U.S. 1158 (1995). There must be some further restriction on the prisoner's freedom of movement in

anticipation of or associated with the interrogation itself. *See United States v. Chamberlain*, 163 F.3d 499, 502-03 (8th Cir. 1998); *see also United States v. Menzer*, 29 F.3d 1223, 1232 (7th Cir.), *cert. denied*, 513 U.S. 1002 (1994); *Garcia v. Singletary*, 13 F.3d 1487, 1490 (11th Cir.), *cert. denied*, 513 U.S. 908 (1994).

In this case, the November 10 interview took place in a relatively uncoercive area of the prison, the correctional officers' lunch room, not a prison cell or interrogation room. *Cf. Alexander v. State of Conn.*, 876 F.2d 277, 283 (2d Cir. 1989). Except for the defendant and the two Hampton police officers, no other persons were present. The defendant was not pressured to disclose information and was free to terminate the interview, an option he exercised upon first meeting the officers. Of his own accord, he called the officers back and agreed to speak with them. In the ensuing interview, the defendant largely controlled the topics discussed and initiated discussion of potential agreements with the State. In fact, until the defendant implicated himself, the officers did not consider him a suspect in the Hampton Beach robbery, creating the fair inference that they did not conduct the interview with the "express purpose of eliciting incriminating statements." *Id.*

■ We do not find that the officers' questioning imposed any additional restraint on the defendant's freedom of movement, and therefore conclude that the defendant was not in custody during the November 10 interview. *Cf. Leviston v. Black*, 843 F.2d 302, 304 (8th Cir.) (no custody where defendant incarcerated on unrelated matter, initiated and voluntarily attended interview, was free to end conversation, and allowed to leave upon request), *cert. denied*, 488 U.S. 865 (1988). The trial court failed to rule specifically whether the defendant was in custody, but based its denial of the motion on the absence of interrogation. Under the rule set forth today, the defendant was not in custody for *Miranda* purposes, and to the extent the trial court found otherwise and relied upon that finding in its order, it erred. Because we reach the same result on different grounds, however, any error in the trial court's analysis was harmless. *Cf. State v. Dellorfano*, 128 N.H. 628, 637, 517 A.2d 1163, 1169 (1986).

Finally, the defendant contends that in sentencing him for both robbery and theft by unauthorized taking the trial court erred under (1) the Double Jeopardy Clauses of the State and Federal Constitutions and (2) the single larceny rule.

We first consider the double jeopardy claim. The Double Jeopardy Clause "protects a criminal defendant from multiple punishments

for the same offense." *State v. MacLeod*, 141 N.H. 427, 429, 685 A.2d 473, 475 (1996) (quotation omitted). Under the federal "same elements" test, we examine whether each statute under which the defendant was convicted requires "proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). In New Hampshire, our inquiry focuses on whether "proof of the elements of the crimes *as charged* will in actuality require a difference in evidence." *State v. Gooden*, 133 N.H. 674, 679, 582 A.2d 607, 610 (1990) (quotation omitted). We analyze the question first under State law, citing federal law only as an aid. *See Ball*, 124 N.H. at 231, 471 A.2d at 350. Because the State Constitution provides as much protection as the Federal Constitution in this area, we address the question only under State law and need not undertake a separate federal analysis. *See State v. Haines*, 142 N.H. 692, 696, 709 A.2d 762, 764 (1998); *United States v. Halper*, 490 U.S. 435, 448-51 (1984).

Accordingly, we examine the statutory elements of the crimes and the factual predicates charged to the defendant. "A person commits theft if he obtains or exercises unauthorized control over the property of another with a purpose to deprive him thereof." RSA 637:3, I (1996). Pursuant to the statute, the State charged the defendant in one indictment with committing "the crime of theft by unauthorized taking in that, at [the Hampton Beach jewelry store], he purposely exercised unauthorized control over a round, loose 1.13 Carot Diamond . . . with the purpose to deprive the owner . . . thereof." The second indictment in identical language charged the defendant with exercising unauthorized control over "an Oval-shaped, loose, 2.48 Carot Ceylon Saphire [*sic*]."

Robbery is committed if a person, "in the course of committing theft . . . : (b) [t]hreatens another with or purposely puts him in fear of immediate use of physical force." RSA 636:1, I (1996). RSA 636:1, III (1996) further provides that robbery is a class A felony if the defendant was armed with a deadly weapon. Under this statute, the State charged the defendant with armed robbery "in that, at [the Hampton Beach jewelry store], and in the course of committing a theft of a bracelet and pendant from [the store clerk], he purposely threatened [the store clerk] and purposely put her in fear of the immediate use of physical force by brandishing a handgun."

In other words, to prove the defendant committed the thefts, the State had to show that he exercised unauthorized control of the diamond and sapphire at the store with the intent to deprive the owner of its property. In contrast, to prove he committed robbery, the State needed to show he took unauthorized control of the clerk's

bracelet and pendant while purposely threatening her with a handgun. Upon comparing the crimes *as charged*, we conclude that the evidence required to prove theft differed from the evidence required to prove robbery.

Likewise, we find no merit in the defendant's argument that double jeopardy is implicated every time a defendant is charged with theft and robbery. While theft is a lesser-included offense of robbery, *see State v. Goodrum*, 123 N.H. 77, 77, 455 A.2d 1067, 1068 (1983) (per curiam), a defendant is placed in double jeopardy only if he is charged with both offenses deriving from the same criminal act, *cf. id. See also Clayton Motors v. Com.*, 417 S.E.2d 314, 315 (Va. Ct. App. 1992). A criminal "act" consists of the sum of discrete actions that together constitute an offense. *See generally* W. LAFAVE & A. SCOTT, SUBSTANTIVE CRIMINAL LAW § 3.2, at 272-73 (1986).

■ Here, the robbery of the clerk and theft from the store constituted two distinct acts involving different property and separated in time and space. *Cf. Wethington v. State*, 655 N.E.2d 91, 97 (Ind. Ct. App. 1995) (if same property taken on same occasion underlies robbery charge and theft charge, convictions for both violate double jeopardy). That both acts arise from the same event, namely the defendant's entry of the store with the intent to steal jewelry, does not merge them for the purposes of double jeopardy. *Cf. Blockburger*, 284 U.S. at 302 (distinguishing between continuous offense and offense consisting of isolated act). We therefore find the evidence sufficient to support two separate convictions without violating double jeopardy. *Cf. Gooden*, 133 N.H. at 679, 582 A.2d at 607; *State v. Barton*, 441 S.E.2d 306, 309 (N.C. 1994).

We turn to the defendant's contention that the single larceny rule required the trial court to consolidate the separate, consecutive sentences for theft and robbery into a single sentence. Assuming, without deciding, that New Hampshire follows the single larceny rule, we hold that the trial court did not err in sentencing the defendant to separate sentences.

Under the single larceny rule, the unlawful taking on one occasion of property belonging to different owners, but in the possession of one victim, constitutes one larceny. *See Mansfield v. Champion*, 992 F.2d 1098, 1102 (10th Cir. 1993). Because ownership does not characterize the crime of larceny, where there is one taking from a single victim of several items belonging to different owners, "there is no ground . . . for allowing the state to split up the single act of

the accused into subjects for different prosecutions." *Reader v. State*, 349 A.2d 745, 747 (Del. 1975). Where there is more than one taking from different victims, each supported by its own set of facts, the single larceny rule does not apply, even if the takings occur on the same occasion. *See Jackson v. State*, 432 S.E.2d 649, 651 (Ga. Ct. App. 1993).

Here, the defendant committed theft when he removed or ordered removed the diamond and sapphire from the store display cases. He then committed robbery when he threatened the clerk with a gun and demanded her bracelet and pendant. The theft and robbery are separate acts of taking distinct from each other and each supported by its own set of facts. *Cf. United States v. Diggs*, 522 F.2d 1310, 1323 (D.C. 1975) (allowing separate convictions of armed robbery where defendant took wallet of employee at gun-point before taking store money). In other words, it is factually possible for the defendant to be guilty of robbing the clerk without also being guilty of committing theft of the store. *See People v. Williams*, 296 N.W.2d 293, 295 (Mich. Ct. App. 1980) (Danhof, C.J., dissenting).

█ The defendant's reliance on *Mansfield* is misplaced. In *Mansfield*, the reviewing court reversed the multiple count conviction of a defendant who robbed a store clerk of his money as well as money belonging to the store. *See Mansfield*, 992 F.2d at 1102. There was only one criminal act, that of taking property from the clerk's possession. *See Rogers v. State*, 890 P.2d 952, 973 (Okla. Crim. App. 1995) (distinguishing *Mansfield*). The single larceny rule properly applied in *Mansfield* to prevent the injustice of multiple convictions of a defendant who robbed a single victim, coincidentally carrying goods belonging to others as well as goods of his own. *Cf. Commonwealth v. Lockhart*, 296 A.2d 883, 885 (Pa. Super. Ct. 1972). It does not apply here where the defendant's convictions "do not rest on proof of one act that is wrongful as to different persons." *Williams*, 296 N.W.2d at 296 (Danhof, C.J., dissenting).

The evidentiary issues raised by the defendant in the notice of appeal were not briefed and are therefore deemed waived. *Stewart v. Cunningham, Warden*, 131 N.H. 68, 71, 550 A.2d 96, 98 (1988).

*Affirmed.*

All concurred.