NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-southern judicial district
No. 2016-0701

THE STATE OF NEW HAMPSHIRE

v.

KATLYN MARIN

Argued: October 24, 2018
Opinion Issued: May 10, 2019

Gordon J. MacDonald, attorney general (Erin E. Fitzgerald, attorney, on the brief and orally), for the State.

Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.

BASSETT, J. Following a bench trial in Superior Court (Temple, J.), the defendant, Katlyn Gage Marin, was convicted of the second degree murder of her three-year-old daughter, Brielle Gage. See RSA 630:1-b, I(a) (2016). Prior to trial, the defendant moved to suppress statements she made to the police prior to being advised of her Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 444, 479 (1966). The defendant's pre-Miranda statements consist of three sets of statements — given at her home, in a police cruiser, and in a family waiting room at the police station — each of which contained a different version of the circumstances giving rise to Brielle's fatal injuries. She also argued that other statements that she made after she had been advised of her Miranda

rights should be suppressed because they were tainted by the illegally-obtained pre-Miranda statements. After concluding that the defendant was not in custody until after she was advised of her Miranda rights, the trial court denied the defendant's motion. The defendant appeals. We affirm.

The pertinent facts are as follows. On November 25, 2014, the defendant called 911 and reported that Brielle was unconscious. Officer Santiago of the Nashua Police Department responded to the defendant's home at approximately 11:30 a.m. He discovered other first responders providing emergency medical treatment to Brielle, who was unconscious on the bathroom floor. Santiago asked the defendant, who was standing near the bathroom door with her two other children, to step into the adjacent bedroom so he could obtain information about Brielle for the purpose of facilitating medical treatment.

Once inside the bedroom, Santiago initially stood near the open doorway while the defendant moved around the bedroom with her children. At some point, Santiago closed the door. Santiago asked the defendant what happened to Brielle, and for information that would aid the first responders. In response, the defendant told Santiago that Brielle had experienced two seizure-like episodes — one that morning, and one the prior evening — and that Brielle's injuries were caused by roughhousing with her other children.

After Santiago began speaking with the defendant, Brielle was transferred to the hospital. Around that same time, Captain Bailey arrived at the home. He introduced himself to the defendant and asked her what happened to Brielle. After the defendant stated that she distrusted the police and wanted to go to the hospital, Bailey repeated his question. The defendant responded that she wanted to see Brielle. Bailey explained that the defendant could not see Brielle at that time because she was being treated at the hospital.

Shortly thereafter, Bailey left the bedroom, and, while he was away, the defendant began using her cell phone. When Bailey returned, he told the defendant that she could not use the phone, and Santiago took it from her. Bailey then told the defendant that she had to leave the home because it was being secured as a crime scene. The defendant said that she wanted to go upstairs to change her pants, which were wet because Brielle had urinated on her. Bailey did not let her go upstairs. Bailey also told the defendant that her children would be taken to the Nashua Police Department, and that he would prefer the defendant go with her children. Bailey then left the home.

After Bailey departed, Sergeant Greene and Detective Hannon entered the bedroom. They reiterated that the home would be secured as a crime scene, and escorted the defendant and her children downstairs, helping gather belongings. Greene told the defendant that her children would be in police custody until the police could determine what had happened. Greene asked

the defendant to come to the police station. The defendant said that she wanted to go to the hospital to see Brielle. Greene told the defendant that she probably would not be able to see Brielle at the hospital at that time. The defendant agreed to accompany the officers to the police station.

During the five-minute drive to the police station, Greene asked the defendant to explain what happened to Brielle. In response, the defendant told Greene that Brielle's first seizure-like episode occurred the prior evening as Brielle began descending the stairs, and that, as the defendant reached out to catch Brielle, they both fell down the stairs. The defendant also described a second seizure-like episode which occurred that morning. She explained that, after this second episode, she attempted to carry Brielle downstairs, but because Brielle was heavy and unconscious, they both fell down the stairs again. The defendant stated that Brielle may have hit her head during each fall.

Upon arrival at the police station, the defendant and her children were escorted to the family waiting room. There, Greene and the defendant continued to converse while the defendant's children ate snacks and played. After approximately a half-hour, Hannon joined the conversation. The defendant again described Brielle's seizure-like episodes and two ensuing falls. However, in contrast to her earlier version of events, the defendant told Greene that Brielle "fell face first and did hit her head on the floor" during the second fall, adding that one of Brielle's siblings had shaken Brielle the previous night.

Greene, Hannon, and the defendant continued their conversation in the family waiting room for several hours. At approximately 5:00 p.m., the New Hampshire Division for Children, Youth, and Families took custody of the defendant's children. Greene then moved the defendant to a special investigations room. Greene requested the defendant's consent to review her cell phone, take photographs of her home, collect her clothing, and examine and photograph her body for injuries in order to verify her account of falling down the stairs with Brielle. The defendant was at first hesitant to consent. However, she ultimately consented to the photographs and the collection of her clothing, but not to a search of her phone, and she agreed with the officers that she was at the police station voluntarily.

The police then took a break and left the interview room. When they returned, the defendant told Hannon that she was bored and wanted to talk. Hannon informed her that she was no longer free to leave, and that the police were obtaining a warrant to examine her and the clothing she had been wearing that morning. He explained to the defendant that they could continue talking if she waived her Miranda rights, and asked if she would consent to an audio and video recording of the interrogation. The defendant did not consent to a recording, but she did waive her Miranda rights. The officers then

3

continued questioning the defendant, stopping periodically for breaks, until 9:11 p.m.

The defendant was charged with manslaughter and two counts of second degree murder. Prior to trial, the defendant moved to suppress the statements that she made to the police prior to her being advised of her Miranda rights. The trial court denied her motion, finding that the defendant was not in custody prior to being advised of her Miranda rights. After a ten-day trial, the defendant was convicted of knowing second degree murder. This appeal followed.

On appeal, the defendant argues that the trial court erred when it: (1) found that she was not in custody prior to being advised of her Miranda rights, and therefore denied her motion to suppress her pre-Miranda statements; and (2) failed to address her argument that the "illegally-obtained pre-Miranda statements" tainted the post-Miranda statements. The State counters that the trial court did not err in either respect, but even if it did, any error was harmless because the State presented alternative evidence sufficient to uphold the conviction. Because we agree with the trial court that, prior to being advised of her Miranda rights, the defendant was not in custody when she made the statements at issue, we need not address the defendant's second argument nor the State's harmless error argument. See Antosz v. Allain, 163 N.H. 298, 302 (2012) (declining to address parties' other arguments where holding on one issue was dispositive).

The defendant cites both the New Hampshire Constitution and the United States Constitution in support of her arguments that the trial court erred. See U.S. CONST. amends V, XIV; N.H. CONST. pt. I, art. 15. We first address the defendant's claim under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

"Before the defendant's responses made during a custodial interrogation may be used as evidence against [her], the State must prove, beyond a reasonable doubt, that it did not violate [her] constitutional rights under Miranda." State v. McKenna, 166 N.H. 671, 676 (2014) (quotation omitted). "In order for Miranda warnings to be required there must be a custodial interrogation by the police." State v. Hammond, 144 N.H. 401, 403 (1999). Here, because the parties do not dispute that the defendant was interrogated by the police, the issue before us is whether the interrogation was custodial.

"Custody entitling a defendant to Miranda protections requires formal arrest or restraint on freedom of movement of the degree associated with formal arrest." McKenna, 166 N.H. at 676 (quotation omitted). "In the absence of formal arrest, we must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable person in the suspect's position would have understood the situation." Id. at 676-77

4

(quotation omitted). "The location of questioning is not, by itself, determinative: a defendant may be in custody in [her] own home but not in custody at a police station." Id. at 677 (quotation omitted). "To determine whether a reasonable person in the defendant's position would believe [her]self in custody, the trial court should consider the totality of the circumstances of the encounter." Id. (quotation omitted). This inquiry includes, but is not limited to, "factors such as the number of officers present, the degree to which the suspect was physically restrained, the interview's duration and character, and the suspect's familiarity with [her] surroundings." Id. (quotation omitted). As the United States Supreme Court has stated, "[t]wo discrete inquiries are essential to the determination" of whether a defendant is in custody:

> first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011) (quotation omitted).

"[T]he trial court's findings of historical facts relevant to the question of custody . . . are entitled to the deference we normally accord its factual findings." McKenna, 166 N.H. at 677. However, because "the ultimate determination of custody requires an application of a legal standard to historical facts, it is not merely a factual question but a mixed question of law and fact." Id. In a custody analysis, "'the crucial question entails an evaluation made after determination of the historical facts: if encountered by a "reasonable person," would the identified circumstances add up to custody as defined in Miranda?'" State v. Ford, 144 N.H. 57, 63 (1999) (quoting Thompson v. Keohane, 516 U.S. 99, 113 (1995)) (brackets omitted). "[A]lthough we will not overturn the factual findings unless they are contrary to the manifest weight of the evidence, we review the ultimate determination of custody de novo." McKenna, 166 N.H. at 677.

We begin our custody analysis by observing that, as in virtually every case, there are some factors that weigh in favor of a finding of custody, and some that weigh against such a finding. Additionally, "our analysis of whether a defendant was in custody during police interrogation is rarely based upon a static set of circumstances. Interrogations are fluid: What may begin as noncustodial questioning may evolve over time into custodial questioning." Id. Thus, there are some factors that evolve as the circumstances change over time. Here, after considering the totality of the circumstances, we conclude that the trial court did not err when it found that the defendant was not in

5

custody when she gave police the pre-Miranda statements in her home, in the police cruiser, and in the family waiting room at the police station.

We first turn to the factors in this case that consistently weigh against a finding of custody. "The accusatory nature of questioning is widely recognized as a factor weighing in favor of a finding of police custody," because "[a]ccusatory questioning often conveys an officer's belief in the defendant's guilt and the officer's intent to arrest." Id. at 681-82. Likewise, "accusatory statements made by the officers and directed at the defendant also weigh in favor of custody." Id. at 683 (emphasis omitted). When "[t]here [is] no evidence of shouting or harsh tones at any time during the interview," it weighs against a finding of custody. State v. Locke, 149 N.H. 1, 6-7 (2002). Here, as the trial court found, and the defendant acknowledges, the tone of the interrogation was non-confrontational and non-accusatory, and the officers did not raise their voices or use harsh language. Moreover, the police officers' questioning was general in character: primarily directed at learning about the nature and cause of Brielle's injuries in order to aid the medical personnel. See McKenna, 166 N.H. at 682 (observing that questioning of a purely general nature weighs against a finding of custody). Thus, unlike in McKenna and Jennings — cases in which the police engaged in confrontational and accusatory questioning of the defendant — here we find that the character of the interrogation weighs against a finding of custody. See McKenna, 166 N.H. at 684 (holding that defendant was in custody in part due to the accusatory and confrontational character of the interrogation); State v. Jennings, 155 N.H. 768, 773-75 (2007) (same).

The defendant argues that because the police were questioning her about Brielle's serious injuries, and because she appeared to be the only person who could have inflicted those injuries, a reasonable person in her position would have understood herself to be a suspect of a crime. She contends that this understanding was reinforced when one of the officers in her home said "this may be a scene" within earshot of her. Although "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," such beliefs are "relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." Stansbury v. California, 511 U.S. 318, 325 (1994) (quotation omitted). We do not find that the officer's comment, even when assessed in light of Santiago's questioning of the defendant, would have caused a reasonable person to understand that his or her freedom of action had been restrained to "the degree associated with formal arrest." McKenna, 166 N.H. at 676 (quotation omitted). Indeed, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." Stansbury, 511 U.S. at 325.

6

Next, we consider the fact that the police were present at the defendant's home only because the defendant initiated contact with the police when she called 911 and reported that Brielle was unconscious. "When someone calls the police, that person should expect some sort of inquiry when the police arrive." State v. Partridge, 122 S.W.3d 606, 610 (Mo. Ct. App. 2003); see also United States v. Thompson, 496 F.3d 807, 811 (7th Cir. 2007) (finding Miranda warnings unnecessary when defendant invited agents into his home and agreed to be questioned); cf. McKenna, 166 N.H. at 684-85 (holding that when the police initiated contact with the defendant, it weighed in favor of a finding of custody). Here, the fact that the defendant initiated contact with the police weighs against a finding of custody.

Also weighing against a finding of custody is the fact that there were never more than two officers interrogating the defendant at any given time. "[T]he involvement of only two officers in the interrogation would weigh against custody." McKenna, 166 N.H. at 685.

We now turn to the factors that, throughout the entire encounter, consistently weigh, at least to some extent, in favor of a finding of custody. We first consider the degree to which the defendant's movements were restrained in the three locations at issue: her home, the police cruiser, and the police station. "[T]he lack of handcuffs or similar devices is not dispositive, . . . effective restrictions on a defendant's movement can be a product of verbal, psychological, or situational restraint." Id. at 678. When a defendant is "not permitted freedom of movement within [her] own home," and is escorted everywhere by the police, it weighs in favor of a finding of custody. United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007); see also Thompson, 496 F.3d at 810 (weighing "whether the individual was moved to another area," in its custody analysis). At a police station, some restrictions on a defendant's freedom of movement are to be expected. See United States v. Pagan-Santini, 451 F.3d 258, 263 (1st Cir. 2006) ("That [the defendant] was not allowed to wander through the FBI premises except under escort is no surprise; it is unlikely that a federal judge would fare any better."). However, the existence and scope of such restrictions still factors into our custody analysis. See State v. Carroll, 138 N.H. 687, 696-97 (2014) (considering whether the defendant "enjoyed freedom of movement throughout the police station," including whether he went "unescorted to the men's room").

Here, the police curtailed the defendant's movements to some extent. Upon his arrival at the home, Santiago immediately asked the defendant to step into another room, stood in the doorway, and eventually shut the door to the room while he questioned her. Bailey also denied the defendant access to the third floor of her home, and eventually required her to leave the home. The officers escorted her downstairs and monitored her while gathering her possessions. The officers repeatedly dissuaded the defendant from going to the hospital to visit Brielle, at one point saying that "it likely wouldn't be allowed."

7

With the defendant's consent, the officers drove her to the police station, and, while there, the officers escorted and monitored her trips to the bathroom — remaining inside the bathroom while the defendant used a stall.

The defendant also argues that the police restrained her freedom of movement and pressured her to go to the police station when, during the initial interrogation at her home, they told her that her children would be taken into custody. Although we do not doubt that it was appropriate for the police to take the defendant's children into custody, it is possible that such an action by the police could be understood by a reasonable person as a restraint on freedom of movement. Cf. State v. Rodney Portigue, 125 N.H. 352, 362 (1984) (observing that the defendant was induced to stay at the hospital with the police because his children were being examined there, but emphasizing that in that case these "were not conditions created by the police to subject the defendant to continued questioning"). Additionally, here, the defendant was never told that she was free to leave. Therefore, this factor weighs in favor of a finding of custody.

The fact that the interrogating police officers are dressed in uniform and visibly armed tends to weigh in favor of a finding of custody. See State v. Sachdev, 171 N.H. 539, 553 (2018). Here, although some of the officers were in plain clothes, others were in uniform, and all were visibly armed. Therefore, this factor weighs slightly in favor of a finding of custody.

One additional factor weighs in favor of a finding of custody. During questioning at the defendant's home, the police told the defendant that she could not use her cell phone. The police then took the phone after she said that she was sending a text message to her lawyer. By not allowing the defendant to use her phone, the police restricted her ability to communicate with others, including her lawyer. See Jennings, 155 N.H. at 774 ("By denying the defendant access to his . . . phones, the police effectively ensured that he was dependent upon them for . . . communication with the outside world."). The officers' confiscation of the defendant's cell phone, especially after she stated that she was attempting to contact her lawyer, weighs in favor of a finding of custody.

There are also a number of factors that evolved as the circumstances changed during the defendant's encounter with the police: her familiarity with her surroundings, and the duration of each interrogation. See McKenna, 166 N.H. at 677, 685-86. We consider these evolving factors in assessing whether, at the time each statement was made, given the "totality of the circumstances," a reasonable person in the defendant's position would believe herself to be in custody. Id. at 677.

The defendant gave the first set of statements in her home. "[A] defendant's familiarity with [her] surroundings . . . often weighs against a

finding of custody." Id. at 685. Here, not only was the defendant familiar with her own home, but she initiated the encounter with the police when she called 911 and reported that Brielle was unconscious. Additionally, the interrogation was short, lasting approximately fifteen to twenty minutes. See State v. Goupil, 154 N.H. 208, 226 (2006) (finding no custody when interview lasted approximately fifteen minutes); cf. McKenna, 166 N.H. at 685-86 (finding that an interrogation lasting one hour and fifteen minutes weighed neither for nor against a finding of custody).

The defendant argues that, considered as a whole, the circumstances here resulted in "the creation of the kind of police-dominated atmosphere that tends to support a finding of custody." (Quotation omitted.) See McKenna, 166 N.H. at 685 (considering "the degree to which the police dominated the scene" (quotation omitted)). Although we agree with the defendant that some of the factors present here weigh in favor of a finding of custody, when the circumstances are considered in their totality, we conclude that the restraints on the defendant's movement in the home were not of the degree associated with formal arrest. Id. at 676-77.

The second set of statements at issue was made by the defendant as she rode in the police cruiser. At that time, the defendant was not under arrest or physically restrained through the use of handcuffs or similar devices. There were two officers present in the cruiser, and the questioning remained normal in tone, and non-confrontational and non-accusatory in character. Moreover, the ride was short, lasting about five minutes, and the defendant was not ordered to ride in the cruiser — she chose to do so for her own convenience. See State v. Carpentier, 132 N.H. 123, 127 (1989) (finding no custody when defendant received police transportation for his convenience). On the other hand, the police cruiser was an unfamiliar location, the defendant was in the presence of visibly armed police officers, and she had not been told that she was free to leave. Nonetheless, on balance, we conclude that the defendant was not in custody when she made the second set of statements.

The defendant made the third set of statements at issue when she was questioned in the family waiting room at the police station. During questioning, Greene sat on the couch and the defendant sat on the chair closest to the main exit, while the children ate snacks and played. The officers restricted and monitored the defendant's movements, although not to a degree that is unusual inside a police station. As was the case throughout the foregoing encounter, the defendant was not placed under arrest, and she was not physically restrained through the use of handcuffs or similar devices. There were never more than two officers interrogating her at any given time. The officers' questioning remained normal in tone, and non-confrontational and non-accusatory in character. We also note that the defendant was not required to go to the police station. That the defendant understood that she was at liberty to leave or refuse the requests of the police is evidenced by the

fact that, once the defendant was moved to the special investigations room, she agreed with the officers that she was at the police station voluntarily, and denied police requests to search her phone and to make a recording of the interrogation.

The family waiting room was, however, an unfamiliar location, and the visibly armed police officers continued to limit and monitor the defendant's movements — even when she used the bathroom. The family waiting room interrogation lasted approximately four and a half hours — with breaks for various purposes — thus weighing in favor of a finding of custody. See, e.g., Mittel-Carey, 493 F.3d at 40 (observing that an interrogation lasting ninety minutes to two hours supported a finding of custody); Jennings, 155 N.H. at 774 (observing that an interrogation lasting nearly two hours supported a finding of custody). Moreover, the defendant was not told that she was free to leave. Nonetheless, after considering the totality of the circumstances regarding the family waiting room interrogation, we conclude that the defendant was not in custody at the time she made the statements in the family waiting room.

Having determined that the defendant was not in custody until after she was advised of her Miranda rights, we conclude that the trial court did not err when it denied the defendant's motion to suppress. Because the Federal Constitution affords no greater protection than the State Constitution, see Mittel-Carey, 493 F.3d at 39-40, we reach the same result under the Federal Constitution as we do under the State Constitution. The additional issues raised in the defendant's notice of appeal, but which were not briefed, are deemed waived. See In re Estate of King, 149 N.H. 226, 230 (2003).

Affirmed.

LYNN, C.J., and HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.