Belknap
No. 88-248

# The State of New Hampshire

### v.

# Mark McDermott

March 6, 1989

*Stephen E. Merrill*, attorney general (*Barbara Keshen*, assistant attorney general, on the brief and orally), for the State.

*Joanne Green*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

BATCHELDER, J.   In this first degree murder case, the State has appealed an order of the Superior Court (*Murphy*, J.) suppressing statements the defendant made to federal drug agents concerning his involvement in the murder of a Meredith man. RSA 630:1-a, I(b); RSA 606:10. After reviewing the record in this case, we hold that the trial court's decision was not against the manifest weight of the evidence and therefore affirm.

In response to the defendant's motion to suppress, the trial court heard four days of testimony from witnesses Curtis Reid, a federal Drug Enforcement Administration (DEA) agent; David Hoyt, another DEA agent; Jerome Mattioli, the then-resident agent in charge of the DEA's Hartford, Connecticut office; Mark McDermott, the defendant; and Betsy Kizis, the chief investigator for the New Hampshire Public Defender. The testimony which was elicited during the hearing evidenced the following factual background.

The defendant, Mark McDermott, has a lengthy criminal background dating back to the early 1970's. He has embezzled funds from the Town of Derry, manufactured illegal drugs, and been involved in international drug smuggling and distribution. In 1977, while in the process of burglarizing the home of a Meredith man named Ronald Gallup, McDermott shot and killed Gallup. He carried the body into the woods and then fled the State. Between 1977 and 1985, McDermott spent much of his time dealing in drugs and engaging in international drug smuggling. In that period, he also served several years in prison, including two years in a Cuban jail.

Over the summer of 1985 McDermott, according to his testimony, decided to break away from his criminal activities. He then lived with a friend and her children in New London, Connecticut. By late summer, he needed cash, as profits from previous drug deals had been stolen. He spoke with several attorneys during the summer of 1985 to ask if they would contact the DEA on his behalf so that he could provide the agency with information pertaining to drug smuggling in exchange for immunity from prosecution. When he was unable to obtain the legal assistance he desired, he decided to

contact the DEA himself. McDermott called the DEA's office in Hartford, Connecticut, on September 20, 1985, and spoke with agent Curtis Reid. In their conversation, McDermott divulged sufficient information about drug-related activities so that Reid agreed to meet with him. McDermott did not tell Reid his name over the telephone.

On September 23, 1985, Reid and agent David Hoyt met with McDermott in New London. At first, McDermott was reluctant to give them his name or any information until he received assurances that they would not prosecute him with the information he provided. The agents replied that neither one of them had ever seen a cooperating individual prosecuted by the DEA with his own information. Agent Reid also explained to McDermott the conditions he would have to satisfy before being accepted officially as a cooperating individual. These conditions included refraining from unauthorized criminal activities, testifying in court, resolving all outstanding warrants and charges, and submitting to a complete debriefing on his past criminal activities.

During their meeting, McDermott informed the agents of his desire to break away from his criminal past, and of his need for money. The agents told him that he would be paid for his information, but the amount would depend upon the quantity and quality of information given. McDermott began to comply with the DEA's conditions by giving the agents a briefing of his criminal involvement over the preceding ten to fifteen years, including his status as a suspect in the murder of Ronald Gallup. Based on the information provided, the agents arranged to meet with McDermott again on September 25, 1985, this time at the DEA's Hartford office.

In Hartford, McDermott underwent a thorough debriefing, except that he did not reveal his participation in the Gallup murder. McDermott was fingerprinted and photographed, and the agency conducted a full investigation into any pending criminal charges. He met again with agents Reid and Hoyt and discussed in much greater detail the information he had provided them on September 23. He also met with Jerome Mattioli, the resident agent in charge of the Hartford office. Mattioli questioned McDermott extensively about his criminal activities, including the Gallup homicide. Although McDermott admitted knowing who had committed the murder, he refused to discuss the matter further.

Despite McDermott's failure to discuss his involvement in the Gallup murder, the DEA immediately began to use him and his information to plan the arrests of certain drug dealers. In fact, on

that day, McDermott tape recorded a telephone call, made at the request of the DEA agents, from Mattioli's office to one of his drug-smuggling associates. As a result of this call and the other information and documentation McDermott was furnishing, the agents gave him $400 for his efforts and for his living expenses. The agents also gave him a tape recording machine and told him to record all drug-related telephone calls. For the next nine days, McDermott was working full-time with the DEA to coordinate a large drug sale in Connecticut. During this time, McDermott recorded all his phone conversations pertaining to drug deals and contacts, and also kept in constant contact with agent Reid.

In his order granting the defendant's motion to suppress, the trial judge made the following findings of fact concerning the events of October 4, 1985, leading up to the defendant's confession to the murder of Ronald Gallup:

"On October 4, 1985 McDermott arrived at the DEA's Hartford offices at approximately 9:00 a.m. On arriving he informed Agent Reid that he was out of money and that he did not have enough gas in his car to return to New London that evening. McDermott told Reid that he needed at least $1,000 to cover his living expenses. Reid indicated he would check with Mattioli on his request some time during the day. McDermott and Reid then turned their attention to planning and documenting the upcoming transaction.

Later on the 25th [sic] McDermott reminded Reid of his financial situation. He also reminded Reid that his housemate was in Florida at the time which required him to return to New London in time to supervise his house-mate's minor children when they returned from school. Agent Reid went to speak with Mattioli about McDermott's request for money. When he returned, Reid told McDer-mott that Mattioli had insisted McDermott reveal every-thing he knew about the Gallup murder or his relationship with DEA would be terminated. Reid also told McDermott that if he divulged the details of Gallup's death he would be paid $1,000. McDermott refused to talk and asked to see Mattioli.

Reid brought McDermott to Mattioli's office. When the two men entered the office Mattioli was counting a large amount of money. After McDermott sat down Mattioli placed the money in a pile on the table in front of

McDermott and began to question him. During questioning Mattioli assured McDermott that the information he provided would not leave the office. He indicated the DEA would never get cooperation from informants if they were prosecuted for the information they provided and that the DEA simply needed the information in order to avoid surprises should McDermott be forced to testify in the future. Finally, Mattioli implored McDermott to reveal the details of Gallup's death and asked McDermott who pulled the trigger. The defendant paused and then responded by saying, 'I did.'

Following the defendant's confession Mattioli continued to question McDermott on the details of the shooting. Mattioli told McDermott that without '*Miranda* warnings' his statements would not be used against him and that nothing would be done with his statements. McDermott proceeded to reveal the details of the shooting and told the agents that he buried the gun he used in a field on a farm in Pennsylvania. McDermott was paid $500 on October 4, 1985."

A few days after the confession, the DEA agents and McDermott flew to Pennsylvania, where they unsuccessfully tried to locate the murder weapon. Upon their return to Connecticut, McDermott continued his work as a cooperating individual and received another five hundred dollars. Toward the end of October, the DEA was able to make several arrests in Connecticut and elsewhere stemming from cocaine transactions arranged in McDermott's home involving individuals whom McDermott had helped set up.

After the arrests, McDermott continued to work for the DEA by transcribing his phone conversations in preparation for the pending trial of those arrested. In November, 1985, having finished his work with the DEA, McDermott decided to move to Florida and so informed the agency. He kept the DEA apprised of his addresses while in Florida. In March, 1986, McDermott was arrested in Florida at an address he had given to the DEA. He was returned to New Hampshire and charged with the first degree murder of Ronald Gallup.

Based on the facts described above, the trial court concluded that the State had failed to satisfy its burden to prove beyond a reasonable doubt that McDermott voluntarily gave his confession. *See State v. Phinney,* 117 N.H. 145, 147, 370 A.2d 1153, 1154 (1977). The trial court also determined that the State had not met its burden under the less stringent preponderance of the evidence

standard required under the fourteenth and fifth amendments to the United States Constitution. *See Colorado v. Connelly*, 107 S. Ct. 515 (1986). Like the trial court, however, we decide this case under our own constitution and need not look to its federal counterpart because the latter does not provide greater protection to individual liberties than does our own. *See State v. Ball*, 124 N.H. 226, 471 A.2d 347 (1983). Federal cases are cited to the extent they help explain or clarify the law under the State Constitution. *Id.* at 231, 471 A.2d at 350.

■■■■■ A determination of the voluntariness of a confession is a question of fact for the trial court to decide, *State v. Wood*, 128 N.H. 739, 742, 519 A.2d 277, 279 (1986), and we will not overturn that decision unless it is against the manifest weight of the evidence, *State v. Copeland*, 124 N.H. 90, 92, 467 A.2d 238, 240 (1983). Under the State Constitution, the standard by which the voluntariness of a confession is judged is whether it is the "'product of an essentially free and unconstrained choice' and was not 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *Id.* (citations omitted). In assessing voluntariness, the court should examine the "'totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *State v. Damiano*, 124 N.H. 742, 747, 474 A.2d 1045, 1048 (1984) (*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). An involuntary confession cannot constitutionally be admitted into evidence. *Damiano, supra* at 746, 474 A.2d at 1047.

The State challenges several aspects of the trial court's decision. First, the State argues that McDermott's personal characteristics and experience were such that he was not likely to confess, even under coercive DEA questioning. Second, the State contends that the trial court erred when it found that the DEA agents coerced the confession by depriving the defendant of money and safety. Because the defendant's concerns predated his association with the DEA, the State argues, a necessary ingredient of involuntary confessions, coercive police activity, is absent from this case. Third, the State complains that the trial court erred in finding that the defendant confessed in reliance upon a promise of confidentiality and monetary reward. Fourth, the State argues that the trial judge improperly analyzed the events at issue by analyzing them from the defendant's subjective perspective. Fifth, the State contends that even if a promise were made, the defendant did not confess in reliance upon it. Finally, the State attempts to distinguish this case from other coerced confession cases on the bases that here the defendant was not suspected of the Gallup murder and that the

DEA agents did not use overbearing methods to get him to incriminate himself.

We need not address in detail each of the State's arguments because we determine that this case turns upon the trial court's finding that agent Mattioli promised McDermott that his statements would not leave the DEA's office. A confession made in reliance upon a promise of confidentiality or a promise of immunity is involuntary and coerced under the State Constitution. *State v. Copeland*, 124 N.H. at 92, 467 A.2d at 240 (statements extracted by direct promises are involuntary); *see also State v. Nash*, 228 Neb. 69, 73, 421 N.W.2d 41, 43–44 (1988) (statement that reasonably could be interpreted as a promise of confidentiality would prevent finding that statement was voluntary); *United States v. Wolf*, 601 F. Supp. 435, 441–43 (N.D. Ill. 1984) (defendant's statements to Canadian agents in reliance upon promise not to give them to IRS were involuntary). Promises to inform other authorities of the defendant's cooperation, *see United States v. Glasgow*, 451 F.2d 557, 558 (9th Cir. 1971), or to recommend reduced bail in exchange for incriminating evidence, *see State v. Reynolds*, 124 N.H. 428, 429–30, 471 A.2d 1172, 1173 (1984), which promises are not dispositive of the issue of voluntariness but add to the State's burden of proof, *id.*, are categorically different from a promise of confidentiality or of immunity from prosecution in exchange for a statement or confession.

In this case, to allow the government to revoke its promise after obtaining incriminating information obtained in reliance on that promise would be to sanction governmental deception in a manner violating due process. *See United States v. Pinto*, 671 F. Supp. 41, 58 (D. Me. 1987) (statements induced by false and deceptive promises are involuntary); *United States v. Goldstein*, 611 F. Supp. 626, 632 (N.D. Ill. 1985) (when government deliberately misrepresents the consequences of a confession, the confession is involuntary and unconstitutional). The promise of confidentiality made by Mattioli supports the trial court's determination that McDermott's confession was given involuntarily. Although the trial court heard conflicting testimony concerning the confidentiality issue, as the finder of fact, the trial judge stands in the best position to weigh witness credibility. *State v. Sullivan*, 130 N.H. 64, 69, 534 A.2d 384, 387 (1987). We affirm the trial court's order suppressing the defendant's confession.

*Affirmed and remanded.*

All concurred.