Hillsborough
No. 88-084

THE STATE OF NEW HAMPSHIRE

v.

STEVEN CARPENTIER

August 16, 1989

*John P. Arnold*, attorney general (*John S. Davis*, assistant attorney general, on the brief and orally), for the State.

*Joanne Green*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

JOHNSON, J.   After a jury trial, defendant Steven Carpentier was convicted of second degree murder in the death of Joyce Milot. Before trial, Carpentier moved to suppress a videotaped statement that he made to members of the Manchester Police Department on January 14, 1986. The Superior Court (*Dalianis*, J.) denied the motion, and the State showed a redacted version of the videotape to the jury at trial. Carpentier now appeals the denial of his motion to suppress. At issue are whether he was in custody when he made the videotaped statement, whether it followed his request for counsel, and whether he made it voluntarily. We affirm.

Following the November 1987 suppression hearing, the superior court made the following findings of fact. Manchester police officers originally contacted Steven Carpentier on December 20, 1985, in their investigation of Joyce Milot's death. They informed him that, although he was not being charged with an offense, he was a possible homicide suspect. They then read him his *Miranda* rights and took a statement. Officers contacted Carpentier again in January 1986 and, with his agreement, made arrangements for him to provide them with blood and hair samples and to come to Manchester for a second interview. It was agreed that the officers would pick Carpentier up in Concord, where he was living with his brother, and drive him to Manchester. The superior court

specifically found that officers provided transportation for Carpentier's convenience.

On January 14, 1986, two officers arrived in Concord dressed in plain clothes and driving an unmarked police car. Carpentier, who had been waiting for them, entered the car unassisted. He was not handcuffed. The officers told Carpentier they would go first to Catholic Medical Center in Manchester for the samples and then to the Manchester police station for the interview. He assented, stating that he wanted to help. After a doctor at Catholic Medical Center explained the hospital's waiver form, Carpentier indicated that he understood the form, requested a copy of the test results, and signed a waiver releasing those results to the police.

Carpentier then accompanied the officers to the Manchester police station. They entered the station through a side entrance and went to the polygraph room, where the interview was conducted. The room had two windows and a door and was approximately 10 by 10 feet in size. It contained mirrored glass, a desk, and a clock. There was also a videotape camera in the room, and officers explained to Carpentier that the interview would be videotaped.

During the interview, three officers were present. Captain Brodeur and Lieutenant Robinson conducted the questioning and Sergeant Jaskolka operated the video camera. The officers gave Carpentier a cup of coffee, which he drank while being questioned. Captain Brodeur informed Carpentier that the Manchester police were interviewing various people in their investigation of Joyce Milot's death. He explained that he would question Carpentier first as to his background and criminal record and then as to his whereabouts on December 18, 19 and 20, 1985. Following this explanation, Brodeur asked Carpentier questions about his family and friends. The superior court specifically noted that Carpentier appeared calm while answering these questions. After Brodeur reiterated that he would next ask about the three dates noted above, he gave Carpentier the State's standard waiver form, containing *Miranda* warnings and a set of questions, and asked him to read the warnings aloud and explain them in his own words.

Carpentier read and indicated that he understood each of the warnings and answered the questions in writing. He stopped at the question "Do you want a lawyer present? Yes/No." Before answering he asked Captain Brodeur, "Do I need one?" Brodeur responded, "Right now, it's just an interview—about the facts that have taken place ... since ... December." Carpentier then indicated on the form that he did not desire an attorney.

When Carpentier had completed the waiver form, Brodeur and Robinson asked him about his relationship with the victim and his whereabouts on the dates indicated. Carpentier answered all of their questions. The superior court specifically noted that the intensity of the interview escalated when the officers confronted Carpentier with an inconsistency between his December 20th statement and information they had obtained from other witnesses, but diminished again when Carpentier denied these inconsistencies.

Shortly before the interview ended, Carpentier indicated that he would be late for work if he did not leave, and the officers soon finished questioning him and drove him to work in Concord. Before leaving, Carpentier stated that he would "be happy" to return another time. During the interview, Carpentier never confessed, asked to leave, or requested an attorney. On January 18th the police discovered a gym bag containing numerous pieces of physical evidence directly implicating him in the victim's death. On January 24, 1986, more than a week after he made the statement at issue, Carpentier was arrested in Florida, where he was staying with family.

Carpentier argues that Manchester police violated his State and federal constitutional rights at the January 14th interview. He claims that he was in custody during the interview and that when he asked, while reviewing the waiver form, whether he needed an attorney, he made a request for counsel for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966), which the officers failed to honor. Carpentier further argues that the police deceived him by minimizing the seriousness of his situation, telling him that they were merely conducting an interview when they intended to subject him to belligerent interrogation. He claims that his statement was thus involuntary. The State counters that Carpentier was not in custody, never requested counsel, and made his statements voluntarily.

Custody determinations for *Miranda* purposes are essentially factual, and we will uphold the superior court's rulings unless contrary to the manifest weight of the evidence or the result of an error of law. *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir.), *modified*, 830 F.2d 127 (1987). Custody entitling a person to *Miranda* protections during interrogation requires "'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). In the absence of formal arrest, the trial court must determine whether a suspect's freedom of movement was sufficiently curtailed

by considering "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). In reaching its decision, the trial court should consider, among other factors, the suspect's familiarity with his surroundings, the number of officers present, the degree to which the suspect was physically restrained, and the interview's duration and character. *United States v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987).

After reviewing the videotape of the January 14th interview and the transcript of the suppression hearing, we find that there is ample factual support in the record for the superior court's findings of fact and custody ruling. Carpentier clearly was not in custody on his arrival at the police station. He came by his own agreement, without physical restraint, and received police transportation only for his convenience. Nor was he in custody at any time during the course of the interview. Initial questioning regarding his background and family was friendly, and Carpentier appeared to answer questions calmly and willingly. Officers did use strong language and loud voices when questioning Carpentier about discrepancies between his statements and those of other witnesses. However, this intense and accusatory questioning lasted less than ten minutes, after which the interview again became relatively unconfrontational.

■ Although it is not dispositive of what a reasonable person in Carpentier's position could appropriately have concluded, it is clear from the videotape that both Carpentier and the police believed that he was free to leave. When he had been interviewed for approximately three hours, Carpentier asked to be taken to work, and, after posing a few more questions, officers drove him back to Concord. At that time, Carpentier emphasized that he would be glad to return for further questioning, stating, in particular, that his brother and sister-in-law would bring him to Manchester whenever the police wanted to talk with him. Both his request to leave and his willingness to return suggest that Carpentier believed he had control over his presence at the station. Indeed, he was not arrested until ten days later, after new and critical evidence had been uncovered. Despite a period of heated questioning, there is ample evidence to support the superior court's conclusion that he was not in custody at any time during the interview.

■ Federal cases make clear that the protections *Miranda* accords are operative only after a suspect is in custody. *See California v. Beheler*, 463 U.S. at 1124. However, even if, as Carpentier suggests, the State Constitution were to require the police to honor *Miranda* warnings once they have given them, his inquiry as to the need for a lawyer did not constitute a request for counsel under the circumstances. Carpentier suggests that his situation was analogous to the one at issue in *State v. Tapply*, 124 N.H. 318, 470 A.2d 900 (1983). There, however, the defendant, who had never expressly waived his *Miranda* rights and had undergone over two and one-half hours of "intensive and very skillful questioning," asked twice before making incriminating statements whether he should have a lawyer. *Id.* at 322–24, 470 A.2d at 903–04. His questions were met with the responses "I know you didn't do it on purpose" and "you've already confessed to us as to what happened." *Tapply*, 124 N.H. at 323, 470 A.2d at 903. We held that, under the circumstances, "[i]nstead of diverting his attention from [his right to counsel], as was done on the first occasion, or in effect telling him it was useless, on the second occasion, the officers had a duty to honor his right." *Id.* at 325, 470 A.2d at 904.

■ Here, Carpentier asked his question, not after "intensive and very skillful questioning," but while contemplating a waiver form in a non-custodial context. In addition, following his question, Carpentier indicated on the waiver form that he did not desire counsel, waived his rights, answered questions, and never mentioned counsel again. We hold that under these circumstances such a statement was insufficient to invoke the right to counsel, particularly after a waiver and without further reference to a desire to have an attorney present. We caution, however, that such a comment might well be sufficient to invoke the right in a custodial situation and that officers would be well advised to respond to any reference to counsel, however ambiguous, by repeating that the suspect may have counsel if he wishes and reminding him that he may request counsel at any time. *See State v. Sundstrom*, 131 N.H. 203, 207–08, 552 A.2d 81, 84 (1988).

■ Carpentier finally argues that his statements were involuntary under the fourteenth amendment to the Federal Constitution and part I, article 15 of the State Constitution because the officers mischaracterized the nature of the intended interview. A review of the record clearly indicates, however, that the statement was voluntary under our more stringent State standard. *See State v. McDermott*, 131 N.H. 495, 500, 554 A.2d 1302, 1305

(1989). A statement is voluntary for purposes of the State Constitution if it was the "'product of an essentially free and unconstrained choice' and was not 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *Id.* (quoting *State v. Copeland*, 124 N.H. 90, 92, 467 A.2d 238, 240 (1983)). Voluntariness is determined based on the "'totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *State v. Damiano*, 124 N.H. 742, 747, 474 A.2d 1045, 1048 (1984) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

█ The superior court explicitly found that the officers did not mischaracterize the nature of their encounter with Carpentier at all, but stated in earnest that they were conducting an interview. A review of the evidence indicates that this finding was correct and that Carpentier could not have been misled in the way that he claims. The interview lasted about three hours and, while not entirely friendly and sedate, consisted mainly of questioning in a reasonable tone on topics the police told Carpentier they would address at the outset. Furthermore, Carpentier, who was no stranger to the criminal justice system, knew that police were questioning him, as they had on December 20th, because he had been with Joyce Milot on the night of her death. While he may not have known that police had information belying his previous statement, he could not have expected, under the circumstances, that an "interview" with police would be without any confrontation or intimation that he might be connected with the crime. There can be no reasonable doubt that Carpentier's statements were voluntary. *See State v. McDermott, supra* at 500, 554 A.2d at 1305.

*Affirmed.*

All concurred.