# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Petitioner,

v.

Randy Collins, Respondent.

Appellate Case No. 2021-001176

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Georgetown County
Larry B. Hyman, Jr., Circuit Court Judge

---

Opinion No. 28197
Heard October 3, 2023 – Filed April 3, 2024

---

## AFFIRMED AS MODIFIED

---

Attorney General Alan McCrory Wilson and Assistant Deputy Attorney General Mark Reynolds Farthing, both of Columbia; and Solicitor Jimmy A. Richardson, II, of Conway, for Petitioner.

E. Brandon Gaskins, of Moore & Van Allen, PLLC, of Charleston, and Chief Appellate Defender Robert Michael Dudek, of Columbia, for Respondent.

---

**CHIEF JUSTICE BEATTY:** Randy Collins was convicted of first-degree arson and criminal conspiracy. The court of appeals reversed and remanded the matter to the circuit court for a new trial on the basis Collins's statement to law enforcement was involuntary and, thus, inadmissible. *State v. Collins*, 435 S.C. 31, 864 S.E.2d 914 (Ct. App. 2021). We granted the State's petition for a writ of certiorari and now affirm as modified. We hold Collins's statement was rendered involuntary when law enforcement gave Collins *Miranda*[1] warnings and subsequently negated them by falsely advising him that his statements would remain confidential.

## I. FACTS

On March 29, 2014, firefighters received a call around 1:15 a.m. and responded to a fire at a mobile home that was rented by Marissa Cohen in Andrews, South Carolina. The neighbor who reported the fire indicated that he believed the home to be vacant (as Cohen had recently removed her belongings). However, upon forcibly entering the locked home and extinguishing the fire, the firefighters discovered the body of a twelve-year-old boy—Cohen's youngest son—who had died from smoke inhalation.

The town's fire marshal, who was also the firefighters' chaplain, was struck by Cohen's reaction at the scene, as she seemed unusually calm for someone who had just lost her son. Investigators quickly determined the fire had been set with an accelerant found in kerosene that had been poured on the floor. Further investigation revealed that Cohen had purchased $20 worth of kerosene the night of the fire; that she obtained a $25,000 contents-only insurance policy on the mobile home a few weeks before the fire; and that she had filed a claim under the policy just a week after her son's death.[2]

Collins became part of the investigation based on an anonymous tip received by an investigator with the Georgetown County Sheriff's Office, Melvyn Garrett

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The insurance company ultimately denied the claim after Cohen was charged with arson.

("Investigator Garrett"), who was told Cohen, Collins, and another individual, Benjamin "Mano" Brown, were involved in the fire.[3]

Investigator Garrett transcribed a short statement from Collins on April 9, 2014, in which Collins denied any involvement and stated he was at a club with James Miller, his nephew, at the time of the fire, and a bartender he knew had been working that night. Investigator Garrett obtained a similar statement from Miller on April 10, 2014, in which Miller stated he was not involved in the fire and had been at a club with Collins.

Investigator Garrett determined there were inconsistencies in the statements from Collins and Miller, however, after he talked to the bartender and other people who had been at the club that evening. Thereafter, officers obtained a search warrant to determine if there had been any communication between the parties. Senior Agent Scott Hardee ("Agent Hardee") from the South Carolina Law Enforcement Division ("SLED"), an arson specialist who assisted in the investigation, reviewed the phone data and discovered that Collins and Cohen had spoken three times just prior to the fire, during the evening hours of March 28, 2014, and again three times after the fire, at 2:50 a.m., 3:01 a.m., and 3:24 a.m. on March 29, 2014.

On June 4, 2014, Collins arranged with Officer Nesmith, someone he already knew, to retrieve his phones at the Andrews Town Hall and Police Department (the offices were located at one complex). Once there, however, Collins encountered Agent Hardee and Investigator Garrett, who knew Collins would be coming to pick up his phones. The two officers were waiting for Collins, as he had previously failed to show up for an interview with them, and they had been trying, unsuccessfully, to reach him.

Collins agreed to talk to Agent Hardee and Investigator Garrett, so the three of them went to a small room on the premises. Prior to the start of the interview, the officers went over a SLED form, entitled "Miranda Rights," with Collins, with the time noted as 10:20 a.m. The form set forth a listing of rights, including the rights to remain silent, to have an attorney present during questioning, and to the appointment of an attorney if he could not afford one. It also included the warning:

---

[3] Brown acknowledged at Collins's trial that he had helped Cohen remove some of her belongings from the mobile home, and Cohen had informed him afterward of her plan to burn the home.

"Anything you say can be used in court as evidence against you." Agent Hardee read the form to Collins, and Collins initialed next to each item. Collins signed underneath a "Waiver of Rights" section at the bottom of the form to indicate that he understood his rights and was willing to talk to the officers without an attorney present. The interview lasted approximately three hours. It was recorded using Agent Hardee's personal video camera, which was similar in size to a cell phone and was reportedly visible to Collins on the table. The battery died at about 1.5 hours in, however, so when Agent Hardee realized that, he replaced the battery to resume the recording.

When asked at the beginning of the interview whether he had any preexisting issues, Collins, who was 43, noted he had a stroke in April 2013 and had been in a car accident in 2006. He also noted that he had gotten little sleep the night before and had not eaten breakfast that morning, as he had not planned to be interviewed. Agent Hardee mentioned that the "word on the street" was that Collins had something to do with the fire. Agent Hardee advised Collins that investigators had determined the fire was intentionally set with kerosene and a young boy died in the fire, so they were trying to figure out who could provide information about this incident. Collins initially denied any involvement in the fire and reiterated his position that he had been at a club named Carnell that evening with Miller, his nephew, although Collins changed the timeline slightly from his prior statement, indicating he went to the club at approximately 11:00 p.m. and left around 2:00 a.m. Collins said he recognized T. Chandler running the bar and spoke to him while Miller played pool. Collins stated Miller took him home after they left the club.

As the officers continued the discussion, Agent Hardee asked Collins to set aside their discussion to that point and just tell them what he thought happened and whether the fire was intentional or "a bad accident." Collins responded that he did not know and did not want to "say the wrong thing." Agent Hardee reassured Collins that the interview was confidential, emphasizing that the door was shut and the blinds were closed in the interview room and that anything Collins told them was only for the "file" and would not "leave this room." The court of appeals accurately recounted this point in the interview as follows:

> Of particular note . . . is an assurance made by Agent Hardee approximately twenty-one minutes into the interview, after Appellant was asked whether he thought the fire was intentionally started, and Appellant responded

he did not want to "say the wrong thing." Agent Hardee responded, "Well, you're not going to say the wrong thing. *Whatever you tell me, it ain't gonna leave this room. This, um, tape is going into my file.* And I'm gonna, I'm gonna burn a copy for him [Investigator Garrett]. And we'll have a copy of this tape. *And it ain't gonna go any further than this room.* That's why we got the door shut, the blinds pulled, there's no sound device in here. I want you to be honest with me and tell me what you think."

*State v. Collins*, 435 S.C. 31, 41–42, 864 S.E.2d 914, 919 (Ct. App. 2021).

The officers reassured Collins that they were interested in Cohen, not him, and that no matter what happened during the interview, Collins would be able to go home that day. However, the officers also told Collins that if he did not tell them anything, he could be facing over thirty years in prison. Collins asked to stop the interview at one point, but he was told not to leave by the officers, as they believed he was on the verge of revealing inculpatory information.

Collins eventually acknowledged that Cohen, who rented the mobile home, had asked him to burn it down. Collins stated he had declined to do it, but he told Miller about Cohen's request. Collins conceded that he was at the mobile home with Miller the night of the fire, but he maintained that he left the scene and was not the person who actually started the fire.

Ultimately, at the conclusion of the three-hour interview, Collins signed a written, two-page statement for the Georgetown County Sheriff's Office that was labeled "VOLUNTARY STATEMENT" on June 4, 2014, at 1:40 p.m. Collins began the statement by maintaining, "I DID NOT DO it." Collins acknowledged that Cohen had asked him to do a "job" of burning down her home and offered him $5,000; that she told him to "think about it"; that he had told his nephew, Miller, about it; that after he and Miller went to the club that night, he told Miller to take him home, but Miller did not and, instead, drove over to the mobile home; after finding the doors to the home locked, Miller pushed a window open and lit a piece of paper and threw it in the window; Miller thereafter drove around the home several times but did not "see anything lit"; and Miller took him home. Collins ended the written statement by indicating Cohen called him and told him that her son was dead and, after that, at around 3:30 a.m., Miller came to his home and also informed him

that Cohen's son had died in the mobile home fire. Collins was permitted to go home after he gave the officers a written statement.

In August 2014, however, Collins was indicted on charges of first-degree arson and of entering into a criminal conspiracy to commit arson with Cohen and Miller. At Collins's trial in 2018, the trial judge admitted into evidence Collins's two written statements and his videotaped interview. Collins was convicted of first-degree arson and criminal conspiracy.[4]

Collins filed a direct appeal challenging, *inter alia*, the admission of his statement to law enforcement on the basis it was involuntary.[5] The court of appeals found the trial judge erred in ruling Collins's statement was voluntary and in admitting it into evidence. *Collins*, 435 S.C. at 54, 864 S.E.2d at 926. The court of appeals noted it was undisputed that officers gave Collins *Miranda* warnings, but thereafter Collins was falsely advised that any statements he made would not be used against him. *Id.* at 51–52, 864 S.E.2d at 924–25. It additionally noted that the officers specifically advised Collins that they wanted information from him to investigate Cohen, and that "no matter what he told them, [Collins] was going to get to go home after the interview," but that if he did not cooperate, they would seek charges against him. *Id.* at 52–53, 864 S.E.2d at 925. The court of appeals concluded that, under the totality of the circumstances, the officers' "coercive and deceptive tactics during the interview caused [Collins's] will to be overborne, inducing him to make the inculpatory statement." *Id.* at 53, 864 S.E.2d at 925. As a result, the court of appeals reversed and remanded the matter to the circuit court for a new trial. *Id.* at 55, 864 S.E.2d at 926.

---

[4] Miller, who was also arrested and charged in this matter, was killed prior to Collins's trial. Cohen's older son, Devon Coombs, pled guilty to the killing of Miller.

[5] For simplicity, Collins's statements will be referred to in the singular. Collins's first written statement denied any knowledge of the fire, so it is not at issue here. The second written statement essentially summarized his oral statements to Agent Hardee and Investigator Garrett in the recorded interview, so these latter two items are the focus of this appeal.

## II. STANDARD OF REVIEW

This Court recently clarified the appellate standard of review when considering whether a defendant's statement to law enforcement was voluntarily made. "We agree with those jurisdictions that have found the question of voluntariness presents a mixed question of law and fact." *State v. Miller*, 441 S.C. 106, 119, 893 S.E.2d 306, 313 (2023). "[W]e will review the trial court's factual findings regarding voluntariness for any evidentiary support." *Id.* "However, the ultimate legal conclusion—whether, based on those facts, a statement was voluntarily made—is a question of law subject to de novo review." *Id.*[6]

## III. DISCUSSION

The State contends the court of appeals erred in finding Collins's statement was involuntarily made and, therefore, inadmissible. We disagree.

There are two constitutional bases that require statements admitted into evidence to be voluntarily made: (1) the Due Process Clause of the Fourteenth Amendment, and (2) the Fifth Amendment right against self-incrimination. *Id.* at 120, 893 S.E.2d at 313 (citing *Dickerson v. United States*, 530 U.S. 428, 433 (2000)). The United States Supreme Court has observed that the requirement of warnings regarding the Fifth Amendment in *Miranda* "does not, of course, dispense with the voluntariness inquiry." *Dickerson*, 530 U.S. at 444.

In the current appeal we are considering the issue of voluntariness, where one factor in the analysis is that the defendant was advised of his rights (e.g., to remain silent, to have an attorney present at questioning) and given *Miranda* warnings, but the warnings were then negated by law enforcement's false assurances of confidentiality. It is the impact *on voluntariness* of these two opposing points—

---

[6] In *Miller* we recognized that, because voluntariness is "a legal question, it is unnecessary going forward for trial courts to submit the question of voluntariness to the jury," but "the parties may continue to argue to the jury why a statement is more or less trustworthy based on its voluntary nature." *Miller*, 441 S.C. at 119 n.10, 893 S.E.2d at 313 n.10. In other words, a trial court's pretrial determination of voluntariness will not prevent a defendant from challenging the reliability of a statement during the trial, as credibility remains an issue for the jury. *Id.* (citation omitted).

warnings of potential consequences, versus a promise of no consequences—that is before us, not the more narrow issue of compliance with the Fifth Amendment warning requirements under *Miranda*.[7]  As a result, the question before the Court is more precisely framed as follows:  Does a false promise of confidentiality give rise to coercion and, thus, a lack of voluntariness, because it intentionally misleads a suspect about *the law*, i.e., the legal consequences and risks of proceeding with an interview with law enforcement, as distinguished from misleading a suspect about *the facts* in an investigation?  We conclude that an intentional misrepresentation of the law in this regard violates due process.  Importantly, we note that we reach this result regardless of whether the false assurance was accompanied by *Miranda* warnings.  A false assurance of confidentiality from law enforcement is inherently coercive because it interferes with a layperson's ability to make a fully informed decision whether to engage in an interview under such circumstances.

Pursuant to *Jackson v. Denno*, 378 U.S. 368 (1964), a defendant "is entitled to a reliable determination as to the voluntariness of his confession by a tribunal other than the jury charged with deciding his guilt or innocence."  *State v. Fortner*, 266 S.C. 223, 226, 222 S.E.2d 508, 510 (1976).  In South Carolina, the trial judge makes this initial determination of voluntariness required by *Jackson v. Denno*.  *Id.* at 226–27, 222 S.E.2d at 510.

"The trial judge's determination of the voluntariness of a statement must be made on the basis of the totality of the circumstances, including the background, experience, and conduct of the accused."  *State v. Saltz*, 346 S.C. 114, 136, 551

---

[7] The court of appeals has noted that "[t]he State conceded in oral argument that if *Miranda* warnings were required here, Agent Hardee's assurance negated the warnings, rendering Appellant's statements inadmissible as a matter of law." *Collins*, 435 S.C. at 51 n.9, 864 S.E.2d at 924 n.9.  The State alternatively contends, however, (1) that *Miranda* warnings were not required because Collins was not in custody and voluntarily agreed to speak to law enforcement, so any promises negating (what it terms) the unnecessary *Miranda* warnings cannot be misleading or coercive, or (2) that Collins was properly given his *Miranda* warnings and executed a waiver of his rights, so he should, therefore, have known not to rely on any contradictory promises by law enforcement.  We disagree with the State on these contentions.  Regardless of whether *Miranda* warnings were initially required, we find law enforcement may not make a false promise of confidentiality during an interview because, ultimately, the impact on due process is the same.

S.E.2d 240, 252 (2001); *see also State v. Moses*, 390 S.C. 502, 513, 702 S.E.2d 395, 401 (Ct. App. 2010) ("In South Carolina, the test for determining whether a defendant's confession was given freely, knowingly, and voluntarily focuses upon whether the defendant's will was overborne by the totality of the circumstances surrounding the confession.").

"If a suspect's will is overborne and his capacity for self-determination critically impaired, use of the resulting confession offends due process." *Saltz*, 346 S.C. at 136, 551 S.E.2d at 252 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 225 (1973)). "Ultimately, the determination will depend 'upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" *Miller*, 441 S.C. at 120, 893 S.E.2d at 314 (quoting *Dickerson*, 530 U.S. at 434). We have noted that "[c]ourts may consider the impact of a number of factors" in assessing voluntariness, such as the accused's youth and maturity, lack of education, or low intelligence; the failure to advise the accused of his constitutional rights; the presence of a written waiver of rights; the physical condition and mental health of the accused; the circumstances of the interrogation, including its length, repeated nature, location, and continuity; the use of physical punishment; whether law enforcement offered specific promises of leniency (as opposed to general comments that cooperation would be beneficial); and whether law enforcement made intentional misrepresentations of the evidence against the accused. *See id.* at 120–21, 893 S.E.2d at 314 (enumerating a nonexclusive list of factors).

"It is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect." *State v. Parker*, 381 S.C. 68, 89, 671 S.E.2d 619, 630 (Ct. App. 2008) (citation omitted). "These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *Id.* (citation omitted).

However, "[c]ertain interrogation techniques, either in isolation, or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller*, 441 S.C. at 120, 893 S.E.2d at 313 (quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). "Coercion is determined from the perspective of the suspect." *State v. Goodwin*, 384 S.C. 588, 601, 683 S.E.2d 500, 507 (Ct. App. 2009) (citation omitted).

We note that, during the oral argument before this Court, the State itself characterized the officer's statements to Collins as "dangerous" and "inexcusable," and it specifically acknowledged that false promises of confidentiality should never be made by law enforcement:

> [T]he comment from Agent Hardee . . . [giving Collins a false assurance of confidentiality] is terrible, should have never been said, and should never be said again by any law enforcement officer in South Carolina.
>
> . . . .
>
> This statement, in addition to being inexcusable, is incredibly dangerous, and it's so disturbing that it occurs in an investigation of a twelve-year-old's death.

Although the State argued the record supported the trial judge's finding that Collins's confession was, nevertheless, voluntary and that Collins's free will was not overborne by law enforcement's false promise of confidentiality, the State further asserted:  "The opinion this Court writes . . . should say that's something that should never have occurred and should never happen again and we condemn it.  The State's right there with you, we condemn it as well."

At the outset, we want to commend the State for its candid and forthright acknowledgements at oral argument, and we accept the State's invitation to unequivocally condemn the interviewing technique employed here.  However, we disagree with the State's contention that the conduct did not render Collins's statement involuntary.  False assurances of confidentiality have been deemed impermissibly coercive and violative of due process in a number of jurisdictions that have had the opportunity to consider the issue, and we find their reasoning persuasive.

In one such case from New Hampshire, a "detective told the defendant that '[w]hat you tell me and what we deal with in here can stay between me and you.'" *State v. Parker*, 999 A.2d 314, 318 (N.H. 2010) (alteration in original).  "Later, the detective stated, '[g]et a little counseling and . . . it's over,' implying, according to the defendant, that if he confessed 'he would only have to do counseling and that he would see his children'; [i.e.,] 'he would not have to go to jail.'" *Id.* (first alteration

in original). The New Hampshire Supreme Court stated, "The defendant contends that these promises 'were so irresistible they rendered [his] confession involuntary.'" *Id.* (alteration in original).

The New Hampshire court reaffirmed its earlier precedent that held promises of confidentiality or immunity from prosecution are "categorically different" from other promises and, when relied upon the defendant, warrant a per se exclusion of the resulting statements. *See id.* at 319 (observing that, for most promises or threats, the court examines the totality of the circumstances to determine if a defendant's will was overborne, but "[t]he totality of the circumstances test . . . does not apply to promises of confidentiality or promises of immunity from prosecution" (citing *State v. McDermott*, 554 A.2d 1302 (N.H. 1989))). The court found the defendant's (Parker's) statements relied upon the detective's false promise of confidentiality and were, thus, involuntary, because after "the detective's promise of confidentiality, the defendant admitted to the sexual assault of [the victims]." *Id.* at 321; *see also id.* at 322 ("Because the interviewing detective made a promise of confidentiality that the defendant relied upon, we hold that the defendant's resulting statement was involuntary.").

In *State v. McDermott*, the New Hampshire court affirmed the trial court's suppression of the defendant's confession. The court indicated the case turned on the trial court's finding that an agent with the Drug Enforcement Administration ("DEA") had told the defendant that the information he provided "would not leave the DEA's office." *McDermott*, 554 A.2d at 1305. The court stated, "[T]o allow the government to revoke its promise after obtaining incriminating information obtained in reliance on that promise would be to sanction governmental deception in a manner violating due process." *Id.* at 1306.

The *McDermott* decision is notable because no *Miranda* warnings were ever given to the defendant. *See id.* at 1304 (noting another false statement the DEA agent made was that the defendant's statements would not be used against him because he had never received *Miranda* warnings). Thus, the *negation* of *Miranda* warnings was not crucial to the appellate court's analysis and conclusion that the defendant's confession was inadmissible. Rather, the court found that the false promise of confidentiality, in itself, *violated due process* because this type of promise is uniquely coercive and egregious, and the false promise rendered the resulting incriminating statements involuntary. *Id.* at 1305–06; *cf. State v. Rezk*, 840 A.2d 758, 487–93 (N.H. 2004) (explaining false promises of confidentiality and

leniency, unlike other types of promises, can be dispositive of the issue of voluntariness, but error in the admission of an involuntary statement is still subject to a harmless error analysis because it is a trial error, not a structural error (citing *Arizona v. Fulminante*, 499 U.S. 279, 307–10 (1991))).

We agree with this analysis. Accordingly, our conclusion today is not premised on the State's contentions regarding whether or not *Miranda* warnings were ever "necessary" in the first instance, as the narrower issue of *Miranda* compliance is not before us. Here, the only reasonable interpretation of the officer's statements to Collins—that the door was closed and the blinds were drawn because nothing would ever leave that room or the "file"—is that they constituted a false promise of confidentiality. Although Collins was assured that he would be going home that day regardless of what he said and that he was not the focus of the investigation, the unspoken truth was that law enforcement could—and did—later seek to use Collins's uncounseled, "confidential" statements against him in a court of law, to his detriment, despite these assurances to the contrary. This misstatement of the law and false assurance by law enforcement regarding Collins's constitutional rights violated due process.

We take care to emphasize that law enforcement is under no obligation to advise a suspect on the law, but having undertaken the task of doing so, law enforcement may not mislead a suspect about the law, particularly as to his critical, constitutional rights. Such misleading statements undermine the fundamental fairness that every defendant is entitled to under the law, and are distinguishable from misleading statements about the facts of an investigation.

In another context (involving false promises of leniency), the Fourth Circuit similarly reasoned that, because it is difficult to determine with certainty the effect that a false promise may have had on an individual defendant, the statements resulting from an unconstitutional inducement should be excluded if there is *any* degree of influence:

> Seventy years ago the [United States] Supreme Court recognized the inherent difficulty of calibrating the effect of an unconstitutional inducement, when it observed [that] "the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and

therefore excludes the declaration if any degree of influence has been exerted."

*Grades v. Boles*, 398 F.2d 409, 412 (4th Cir. 1968) (quoting *Bram v. United States*, 168 U.S. 532, 543 (1897)); *cf. Porter v. State*, 239 S.E.2d 694, 696 (Ga. Ct. App. 1977) (discussing assurances by a GBI agent that the defendant's statement "would not be used against him" and that "it was being recorded just so the agent's secretary could type his notes" for the file and holding "[a] confession given under such a pretense may not be admitted against the confessor").

Based on the foregoing, we agree with the court of appeals' conclusion that Collins's statement was involuntary. We modify its decision slightly to clarify that a false statement of confidentiality can be conclusive on the issue of voluntariness, regardless of the existence or negation of *Miranda* warnings (or the need to examine the totality of the circumstances). However, the erroneous admission of an involuntary statement is still subject to a harmless error analysis. *See Rezk*, 840 A.2d at 487–93.

Having found Collins's involuntary statement was erroneously admitted into evidence, we must consider whether the admission of the involuntary statement was, nevertheless, harmless beyond a reasonable doubt in view of the entire record. *See State v. Pagan*, 369 S.C. 201, 212, 631 S.E.2d 262, 267 (2006) ("Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result."); *State v. Morris*, 289 S.C. 294, 297, 345 S.E.2d 477, 479 (1986) ("We recognize the doctrine that where a trial court error is harmless beyond a reasonable doubt, it does not constitute grounds for reversal. It is a doctrine which should be employed guardedly, however, and on a case by case basis." (citation omitted)); *State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989) ("When guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached, the Court should not set aside a conviction because of insubstantial errors not affecting the result.").

"Whether an error is harmless depends on the particular circumstances of the case." *State v. Reeves*, 301 S.C. 191, 193, 391 S.E.2d 241, 243 (1990). "No definite rule of law governs this finding; rather the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *Id.* at 193–94, 391 S.E.2d at 243.

In the current appeal, the State has argued Collins's statement was voluntary and was properly admitted into evidence, positions that we have rejected. The State did not specifically rely on harmless error. Nevertheless, we find the error clearly is not harmless because Collins's statement was the key evidence placing him at the scene of the fire and linking him to Cohen's arson scheme. *Cf. State v. Byers*, 392 S.C. 438, 447, 710 S.E.2d 55, 59 (2011) ("Petitioner argues the admission of Crisco's hearsay testimony was prejudicial because Crisco's testimony comprised the State's only evidence placing Petitioner in the vehicle at the time of the robbery. We agree that without Crisco's testimony, the jury had little evidence from which to conclude Petitioner was in the vehicle at the time of the robbery. Therefore, we find it was prejudicial error to admit Crisco's testimony, and we reverse the conviction on that ground.").

Collins's situation is distinguishable from cases where the inadmissible evidence is merely cumulative to other, unchallenged or properly admitted evidence in the record. *Cf. State v. Miller*, 441 S.C. 106, 129, 893 S.E.2d 306, 318 (2023) ("Here, as at trial, Petitioner does not challenge the voluntariness or admissibility of his three other confessions to Capers, Sabb, and Chief Williams. The allegedly involuntary confession to Agents Johnson and Merrell was cumulative in every material respect to the prior three admissible confessions."); *State v. Henderson*, 286 S.C. 465, 472, 334 S.E.2d 519, 523 (Ct. App. 1985) (concluding the defendant's erroneously admitted pretrial confession was harmless error because "the defendant made virtually the same damaging admissions" at trial, so "the defendant's statement to the police was merely cumulative" to other evidence of guilt).

For these reasons, we conclude the error in the admission of Collins's involuntary statement was not harmless beyond a reasonable doubt.

## IV. CONCLUSION

We agree with the court of appeals that Collins's statement was rendered involuntary by law enforcement's false assurance of confidentiality and was, therefore, inadmissible. Although law enforcement has no obligation to advise a suspect as to the law, we reiterate that officers may not mislead a suspect about the law, particularly their constitutional rights. We further find the error in the admission of the involuntary statement was not harmless beyond a reasonable doubt, as it was essentially the only evidence placing Collins at the scene of the fire and linking him to the arson scheme. Consequently, we affirm the court of appeals as

modified, on this specific ground, and we agree Collins is entitled to a new trial. We decline to reach the State's remaining issues.

**AFFIRMED AS MODIFIED.**

**KITTREDGE, FEW, JAMES and HILL, JJ., concur.**